```
1                   IN THE UNITED STATES DISTRICT COURT

2                   IN AND FOR THE DISTRICT OF DELAWARE

3                                - - -

4
       NEXSTEP, INC.,                    :   CIVIL ACTION
5                                        :
                        Plaintiff,       :
6                                        :
              vs.                        :
7                                        :
       COMCAST CABLE                     :
8      COMMUNICATIONS, LLC,              :
                                         :
9                       Defendant.   :   NO. 19-1031 (RGA)(SRF)

10
                                    - - -
11
                                    Wilmington, Delaware
12                                  Tuesday, September 15, 2020
                                    10:11 o'clock, a.m.
13                                  ***Zoom conference

14                                  - - -

15     BEFORE:  HONORABLE SHERRY R. FALLON, U.S. MAGISTRATE JUDGE

16                                  - - -

17     APPEARANCES:

18
                    POTTER, ANDERSON & CORROON, LLP
19                  BY:  PHILIP A. ROVNER, ESQ.

20
                              -and-
21

22

23

24
                                    VALERIE J. GUNNING
25                                  Official Court Reporter
```

```
1    APPEARANCES (Continued):

2
                KRAMER LEVIN NAFTALIS & FRANKEL LLP
3               BY:  PAUL J. ANDRE, ESQ.
                     (Menlo Park, California)
4

5                       -and-

6               KRAMER LEVIN NAFTALIS & FRANKEL LLP
7               BY:  AARON M. FRANKEL, ESQ.
                     (New York, New York)
8

9                   Counsel for Plaintiff

10

11              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                BY:  JACK B. BLUMENFELD, ESQ. and
12                   BRIAN P. EGAN, ESQ.

13
                        -and-
14

15              WILMER CUTLER PICKERING HALE AND DORR LLP
                BY:  WILLIAM F. LEE, ESQ.,
16                   SARAH BEIGBEDER PETTY, ESQ.,
                     KATE SEXTON, ESQ. and
17                   RAUVIN A. JOHL, ESQ.
                     (Boston, Massachusetts)
18

19                      -and-

20              WILMER CUTLER PICKERING HALE AND DORR LLP
21              BY:  MARY (MINDY) V. SOOTER, ESQ. And
                     NORA Q.E. PASSAMANECK, ESQ.
22                   (Denver, Colorado)

23                  Counsel for Defendant
24

25                      -  -  -
```

```
 1                    P R O C E E D I N G S

 2

 3                    (The Zoom conference was held beginning at

 4       10:11 a.m.)

 5

 6                    THE COURT:  All right.  Let's start.  I believe

 7       our court stenographer has joined, and if there are any

 8       issues, I will ask my law clerk to bring them to my

 9       attention before we go much further.

10                    Please confirm that Ms. Gunning is able to hear

11       me, and then when counsel makes their introduction, I need

12       to be informed if Ms. Gunning is having difficulty hearing

13       anyone else who is speaking.  All right.  And this won't be

14       deducted from your time, counsel.  You'll have your full

15       allotment time to make sufficient arguments.

16                    The other preliminaries aside from muting your

17       phones when you are not speaking are to make sure that you

18       go slowly because there will be a delay between the spoken

19       word and the ability of the court stenographer to record

20       it.

21                    Obviously, just as in court, please don't speak

22       over anyone else.  I will, if I have questions, I will try

23       to wait for a pause in the advocacy before I interject.

24       Otherwise, I will reserve my questions until the end of the

25       presentation.
```

 1                    Another preliminary is I am familiar with the

 2      principal concepts of claim construction.  I would

 3      appreciate it in your introduction if you wouldn't lecture

 4      so much on those principles and legal contexts, but

 5      certainly, if you want to draw my attention to them, please

 6      weave them into the arguments you're making when we get to

 7      specific terms.

 8                    I think our time is best used diving right into

 9      the terms.  If you want to give me some background, that's

10      fine, but obviously, you know, I want to streamline the time

11      so that both sides are using their time most sufficiently in

12      the presentation.

13                    If we have any difficulties going forward,

14      please speak up and let me know.

15                    My video keeps going out and I have to restart

16      it, so I apologize for that.  I don't know what the issue

17      is, and I'm also getting audio alerts.  Let me check my

18      audio.

19                    I'm getting some errors presented to me in this

20      connection, so let me mute again.  Please raise your hand if

21      you are having any difficulty streaming.  I keep getting

22      these alerts that my video is not being detected.

23                    Is anyone having difficulty hearing?

24                    MR. ANDRE:  Your Honor, this is Paul Andre.

25      Your video is freezing and your audio is cutting in and out

1    at times.

2              THE COURT:  All right.  Let's see how far we can

3    get before I have to take a break and bring my IT staff in

4    here.

5              I did, in addition to the legal preparation, I

6    did a test preparation and everything seemed to be

7    functioning fine and I think I'm ready to go with being able

8    on my monitor pull up slide deck and everything that I

9    received, so let's see how far we can get.  If it becomes

10   distracting, I will take a break.  I may have to get IT in

11   here sooner than I anticipated.

12             All right.  Let's start with introductions of

13   counsel.  For NexStep?

14             MR. ROVNER:  Yes.  Good morning.  It's Phil

15   Rovner from Potter Anderson for plaintiff NexStep and with

16   me from the firm of Kramer Levin are Paul Andre and Aaron

17   Frankel.

18             MR. ANDRE:  Good morning, Your Honor.

19             MR. FRANKEL:  Good morning, Your Honor.

20             MR. ROVNER:  And, Your Honor, you cut out again.

21             THE COURT:  Yes.  I'm trying to pay attention

22   here to the...

23             MR. ROVNER:  I was going to say it was good to

24   see you, but now I can't.

25             THE COURT:  All right.  It's 10:19.  Let's take

1    a break and restart this at 10:30.  And I'm not sure that

2    everyone has to disconnect so much as just put yourself on

3    mute and also your video feed if you prefer, but I'm going

4    to get some IT assistance to find out why I keep cutting

5    out, so --

6              MR. BLUMENFELD:  Judge, this is Jack Blumenfeld.

7              I'm getting a message on my computer that your

8    network bandwidth is low.  I don't know anything more than

9    that, but that's the message I'm getting.

10             THE COURT:  Well, that may be.  There are quite

11   a few proceedings going on today and let me see, but thank

12   you for that, Mr. Blumenfeld.

13             Let's take a break until 10:30.  I will see if

14   our IT folks can help us out.  It may very well be that I

15   have to dial in on the audio only line and I could stay on

16   the bench and still utilize the setup here, but let me see

17   if there's some alternative to fix it.

18             MR. LEE:  Your Honor, this is Bill Lee.

19             When you talk to your IT folks, one possible

20   solution is for those of us who are not talking to both mute

21   and stop our video and that may give you more bandwidth.  It

22   may be a possible solution.

23             MR. THOMAS:  And, Judge, this is Geoff Thomas,

24   the trial tech for NexStep, the one who is hosting the Zoom

25   for everybody.

1           Two options would be if you change, you know,

2     instead of using the audio only call-in information, you

3     click the arrow up next to the mike.  There's a switch to

4     phone audio.  What that allows you to do is you're still --

5     it allows the video to be associated with your audio so when

6     you talk, it doesn't change pictures.

7           The issue you're going to have is if you go to

8     audio only, then we would have to un-mute it to allow you to

9     talk, which then opens it up for anybody who is on that line

10    to also talk.

11          THE COURT:  Right.  Plus -- yes.  Plus I'm

12    concerned about quality of sound given what we just

13    experienced with Ms. Gunning announcing her presence on the

14    line and the echoing.  All right.

15          MR. FRANKEL:  Your Honor, just one thought.

16    It's Aaron Frankel.

17          I've been able to hear everything you've said

18    the whole session.  I mean, video is cutting in and out, but

19    we can hear you very clearly, so I'm not sure if you need to

20    make an alternative arrangement for your audio.

21          MR. THOMAS:  If you keep your audio off, that

22    will conserve bandwidth and the parties are okay not seeing

23    you and hearing you.  You're probably more interested in

24    seeing everybody else.  That will conserve bandwidth and may

25    help as an alternative option as well.

```
 1               THE COURT:  Okay.  Maybe we'll proceed that way.
 2   The problem is I'm glad you're reassuring me that you are
 3   all hearing me.  I'm getting these audio alerts that are
 4   telling me that the computer is failing to detect my
 5   microphone and to make sure my microphone is properly
 6   connected, and then when I hit the tab to check my audio
 7   devices, I can see that I am coming through on the
 8   microphone, and it is checked to automatically adjust
 9   microphone volume.
10               So I'm pleased that you all are able to hear me,
11   but I'm getting these alerts, so, all right.  If we're ready
12   to proceed, then let's try it out.  I will keep my video
13   off, and as long as you can hear me and I can certainly see
14   all of you and hear all of you, I think that we're able to
15   proceed.
16               So with that, I think we had gotten through
17   introductions of counsel.  I'm not sure if we completed the
18   introductions for Comcast, so please state your names on the
19   record.
20               MR. BLUMENFELD:  Good morning.  It's Jack
21   Blumenfeld for Comcast.
22               Also on for Comcast from Wilmer Hale are Bill
23   Lee, Mindy Sooter, Sarah Petty, Rauvin Johl, Nora
24   Passamaneck and Kate Sexton, and Mr. Lee, Ms. Sooter and Ms.
25   Petty are planning on splitting the argument with Your
```

1   Honor's permission.

2           Also on are my partner, Brian Egan, and from

3   Comcast, Heather Falton and Terry Evans.

4           One little issue, I raised this with Mr. Rovner

5   last week, is that we, because the first two terms,

6   palm-held remote and remote control device are briefed

7   together, at least in our section of the brief, we would

8   like to argue those two terms together.  I don't think we

9   have an issue about that, but I wanted to raise that with

10  Your Honor before we started.

11          THE COURT:  I'm glad you did because I had a

12  question about how the parties wanted to handle that, and

13  I'm fine with however you choose to proceed.

14          As you know, we'll go term by term and I will

15  hear one side and the other side and any replies.

16          We'll, as I said, take a break midway, and I

17  don't know if the parties will be alternating and which side

18  will present first on a particular term.  Again, that's fine

19  with me if you choose to do it that way.  I will leave it

20  entirely up to all of you.

21          So with that, we'll start with the brief

22  introductions and I will hear from NexStep first.

23          MR. ANDRE:  Good morning, Your Honor.  This is

24  Paul Andre for NexStep.  Can you hear me okay?

25          THE COURT:  I can hear you very well.  Thank

1  you.

2          MR. ANDRE:  Great.  So we will be going through

3  our slide deck here as we give the brief introduction, and

4  Mr. Blumenfeld talked about we're going to do the first two

5  terms together.  We believe they are different terms

6  requiring different constructions, but we did agree to do

7  them together.  I will be doing the first two terms and then

8  Mr. Frankel will be doing the following four terms.

9          So with that in mind, if we go to the slide

10  deck, we go to slide 2.

11          I do want to tell you a little bit about

12  NexStep.  I think everyone in the United States and probably

13  the world knows who Comcast is, but NexStep is not as

14  well-known.  NexStep was founded by Dr. Robert Stepanian.

15  And Dr. Stepanian, after receiving his Ph.D. from Stanford

16  in the late 1900s, he went to work for a series of Silicon

17  Valley startup companies.  In early 2000, when his company,

18  he was the executive vice president was acquired, and Mr.

19  Stepanian thought this would be a good time to start his own

20  company.

21          In 2004 he founded NexStep in Silicon Valley.

22  The idea of NexStep was to build devices to make our life

23  simpler.  It was just that easy.  He wanted to have -- he

24  saw the world being more complex, more technology, more

25  devices, and so he wanted to have a new product that would

1    bring all of those together and enable cloud based analytics

2    and also make it easier for it to connect and to help

3    automation, et cetera.

4              Now, one of the things that Mr., Dr. Stepanian

5    did was after he first came up with the idea in 2004, he

6    started working on it.  In 2005 he started filing for his

7    patents to protect his innovations, and once he developed

8    products in 2007 and beyond, he decided it's time to go to

9    market, and one of the companies he went to was Comcast.

10             He signed a nondisclosure agreement with

11   Comcast.  He had meetings, several meetings with Comcast and

12   he disclosed the technology to Comcast.  An these are not

13   low level meetings.  These are meetings with the chief

14   technology officer, executive vice president, vice president

15   of technology.  After he disclosed all of his technology to

16   Comcast, Comcast decided that they would not work with Dr.

17   Stepanian or NexStep and decided to develop the technology

18   on their own.

19             Now, Dr. Stepanian would prefer to be partnered

20   with Comcast.  And in this case, if we go to slide 3, we're

21   asserting nine patents.  These patents are all related in

22   one way or another.  They all relate to, go back to his

23   original concept in 2004/2005.  Unfortunately, it was nine

24   patents.  We don't have the unlimited terms you normally see

25   in this type of case.  The claims themselves are very

self-apparent.

If you go to slide 4, you see that we did agree on four of the terms.

If you go to the next slide, slide five, you see there's only six terms that are in dispute here.  You'll notice both in the agenda and in this slide, we're switching the order of terms 3 and 4, and that's just because it's logically the best way to do it that way.  The parties agreed to that.

So as I said, we will be looking at terms 1 and 2 together.  I will argue those and Mr. Frankel will argue 4, 3, 5 and 6.

Now, 1 and 2 are similar, but there is a difference.  One is a palm-held remote, meaning a remote you hold in the palm of your hand, and the other is just a remote control device, not necessarily a palm-held remote.  And there are differences.  There are different claims and they went through different prosecution histories.

As we go through this, I will discuss the differences.

If we go to slide 6 -- Your Honor, I'm not going to lecture you on claim construction, but one of the things that is important in this case and unique is that the claims themselves define the scope.  You shouldn't limit the preferred embodiment, Your Honor, that meaning having a

1    presumption for the ordinary meaning.  Your Honor is well

2    aware of that.

3              What the claims in this case are about are very

4    detailed claims that define the scope of the terms they're

5    in and then also applied to the prosecution history estoppel

6    argument that Comcast raises.

7              So let's go to the terms.  If we go to slide 7,

8    and you see where we have our ordinary meaning of palm-held

9    remote and remote controlled device.  I don't think there's

10   a person, at least in the United States and probably the

11   world who doesn't know what a remote control is.  My

12   children learned what a remote control was by the time of

13   age three.  It's not a complex, you know, theory.  It's

14   something that is tangible.  It is real.  A palm-held

15   remote, as I said, is something you hold in the palm of your

16   hand.

17             So our plain and ordinary meaning of the

18   construction is a hand-held remote control device, part of

19   the other claim requirements.  The remote control device,

20   not the palm-held, is a device for remote controlling other

21   devices that meet the other claim requirements.

22             Comcast tries to run these two together and put

23   into a simple handheld device and they tried to put a

24   negative limitation in that contrasts the smartphone.  They

25   cannot be co-complex data streams such as IP-TV or VoIP.

1    And they used both definitions, that same definition for

2    both claim terms, which in and by itself is incorrect, but

3    we'll get to that when we get to the basis for their

4    negative limitations.

5              Go to the next slide, slide 8.

6              As I said, one of the things that is unique

7    about these claims is the claims themselves provide

8    definition.  You look at the palm-held remote claim term in

9    claim 10 of the '130 patent, and that's the only place it

10   appears, is in the '130 patent.  It tells you what it is.

11   Wherein the palm-held remote integrates the speaker,

12   microphone, volume control, et cetera, et cetera.

13             What I want to point the Court's attention to,

14   it talks about the third claim element, consol component

15   integrate at least a media card.  And you see in this claim

16   element that the claim itself provides that the console

17   component actually decodes the device through a remote

18   controlled device.  That's the fourth line down in that

19   claim element, the wherein element, the second wherein

20   element.

21             So you can see there that the patentee actually

22   took the console component and put in functionality there.

23   Now, what is important about that is that is the negative

24   limitation that Comcast tried to put into the palm-held

25   remote above, so it doesn't make sense that a palm-held

1    remote says you can't do that and a console component says

2    it does do the decoding.  And we'll talk about that when we

3    get to the prosecution history.

4            The same with remote control device on slide 9

5    is that it is self-apparent what is being claimed.  A remote

6    control device, there's not a human being in the world who

7    doesn't know what that means, and the patentee in this case

8    did not give remote control device a special meaning.  What

9    it did was, the patentee went in and gave a definition of

10   remote control device based on the limitation and the claims

11   themselves.  You'll see that throughout this entire

12   presentation.

13           Now, what support do we have for the ordinary

14   meaning other than the fact there's a strong presumption for

15   it legally and the fact that there's no special meaning.  I

16   mean, as Your Honor is aware, there's only three instances

17   where you get away from the ordinary meaning.  One is if

18   there is no ordinary meaning.  You have to look to the

19   intrinsic evidence, maybe even extrinsic evidence to find

20   the definition.

21           Two is if the patentee acted as his own

22   lexicographer and gives a very specific definition in the

23   specification or the intrinsic record.

24           And three is if there's an express and explicit

25   disavowal of a claim scope.

1          Now, I don't think anyone could look at this

2    patent and think that the patentee gave the palm-held remote

3    or the remote control device a special meaning or it doesn't

4    have an ordinary meaning.  It clearly has an ordinary

5    meaning.  There's nothing in the specification that gives it

6    a very special meaning.  In fact, if you look at the

7    specification, go to the next slide, and we go to the

8    specification, it talks about one aspect of the remote is to

9    provide a complete input/output platform in the palm of the

10   user's hand.

11          Now, one of the things I like doing in these

12   claim construction hearings is to actually look at, get away

13   from the slides a little bit and look at the actual

14   exhibits, because what I've found is the cherry picking of

15   quotes out of context and the brackets and ellipses, like I

16   see in the Comcast section of the brief, I always wonder

17   what is being changed or what is being deleted from the

18   actual context.

19          So we can go to Exhibit A-1, which is the '130

20   patent as an example.  And if you go to column 3 of this

21   patent, the bottom paragraph, it says, "In a fifth

22   embodiment."  We can blow that up.

23          Now, this to me is very telling.  In the fifth

24   embodiment, the remote is emphasized.  One aspect of the

25   remote is to provide a complete input/output platform in the

1    palm of the user's hand.

2              Now, that gives you the idea of a palm-held

3    remote.  And then it says, "The features adaptable to VoIP

4    and/or video phone operation, such as a microphone, can be

5    used for other purposes, such as dictation, note-taking,

6    voice messaging, listening to music or remote viewing

7    video."

8              That embodiment even by itself would preclude

9    Comcast's proposed definition, construction of this term,

10   but it goes on and talks about further down in the

11   paragraph, it says, to support the high demand of streamed

12   video, a broader communication channel, such as Bluetooth

13   Version 2 or later or 802.11 -- that's probably that WiFi

14   code -- and a more powerful processor are included.  The

15   patentee has already said that the, that what is included in

16   the remote in the specification can include WiFi

17   communication, Bluetooth, more powerful processors.  It says

18   that the remote may function in tandem with a console, a PC

19   or a set top cable or satellite box.

20             And then the next sentence is key here.  It also

21   could be configured to control other consumer electronics

22   such as a TV, IP-TV, home theater system, component stereo,

23   digital video recorder, DVD player or recorder, VCR, et

24   cetera.

25             IP-TV is the exact technology that Comcast is

1    trying to read out of the remote.  It's trying to say that

2    the remote cannot be code complexation such as IP-TV or

3    VoIP, V-o-I-P.  You see in this paragraph, the fifth

4    embodiment, that makes the Comcast construction untenable

5    with the actual specification.

6              We can look at the drawings as well, and in our

7    slide deck, we showed Figure 7.  We can go to the definition

8    or the description of Figure 7 in this patent if we go to

9    column 15 of Exhibit A-1.

10             Midway down you'll see a line 22, there's two

11   paragraphs talking about Figure 7.  The first paragraph,

12   we'll start with that.  It says, a digital butler remote

13   board as an Xscale processor based solution with a camera

14   module and/or memory card reader.

15             This remote is built around the Intel Xscale

16   microcontroller or a digital signal processor.  Now, this

17   processor is a very common processor, and this idea of the

18   remote is limited to a very simple remote.  It cannot have

19   these type of complex processors as Comcast would have the

20   Court believe, just do not sync with the actual

21   specification.

22             THE COURT:  Let me interrupt there if you don't

23   mind.

24             MR. ANDRE:  Okay.

25             THE COURT:  I know we're going to get to

1    NexStep's responses to the patent prosecution disavowal that

2    the defendant has brought up in the briefing, but while

3    we're on this embodiment, other than Figure 7, where in the

4    specification and any other parts of the intrinsic record

5    does it describe the remote itself as performing this

6    processing?

7              MR. ANDRE:  Well, going back to the fifth

8    embodiment in column 3 that I just went over, it has this

9    exact -- the exact embodiment has the complete input/output

10   platform in the remote, and that's specifically talking

11   about the remote itself, and it talks about being able to,

12   configured to control IP-TV and VoIP.

13             So I will give you two examples in column 3 and

14   then in Figure 7 as well, and the point being there's

15   nothing in the actual specification that would limit the

16   claim construction to a simple handheld device that is in

17   contrast to a smartphone and cannot be co-complex streams.

18   In fact, the paragraph that I just read talked about doing

19   exactly that, and if you look in the next two paragraphs,

20   talking about Figure 7, it actually has a -- the processor

21   to do exactly that, to look at digital signal processing,

22   DSP, the complex digital streams.

23             So my point is there's nothing in the

24   specification, and Comcast can't point to anything in the

25   specification that says the remote -- sorry about that --

1    the remote cannot do these type of processes.  In fact, just

2    the opposite.  And my point here is that, you know, you

3    should give the remote control device or palm-held remote

4    its ordinary meaning unless there's something specific in

5    here that would dictate otherwise, and there's nothing in

6    the specification or the claim language itself that would

7    dictate otherwise.

8             THE COURT:  Well, we talked about specification

9    and claim language and I don't want to jump ahead if you are

10   getting there, but what about patent prosecution, which is

11   largely what Comcast's argument is built around?

12            MR. ANDRE:  Exactly.  And that is kind of the

13   lead-up to really this case and what these terms come down

14   to is the prosecution history, because we know they have

15   ordinary meaning.

16            I can show you in the specification where

17   there's no limitation to a remote control device or

18   palm-held remote, so the only thing that Comcast can hang

19   its hat on is if it gives this interpretation of the

20   prosecution history as an express and explicit disavowal of

21   claim scope.  So that's what I was going to go through next

22   unless Your Honor has any more questions about the

23   specification.

24            THE COURT:  No.  Please proceed.

25            MR. ANDRE:  Okay.  So as I said just a few

1    minutes ago, and we can go back to the slide deck.

2              Now, Your Honor, I won't address claim

3    differentiation.  It's in slide 12.  I think you know what

4    claim differentiation is.  The claim differential argument

5    as well, we put our briefing in the case, our proposed

6    construction.

7              Go to slide 13.

8              There are two aspects to talk about disavowal.

9    One, these are different claim terms.  We're handling them

10   together, but that's how Comcast briefed it, but there's no

11   alleged disclaimer during the prosecution of these patents

12   relating to remote control device patents.

13             The palm-held remote patent, the prior art is

14   based on an express claim.  We give a quote from Exhibit

15   B-50, but as I said, I like looking at the actual exhibit to

16   put it in context.  Comcast points to three exhibits for

17   their disclaimer argument.

18             On page 16 of their brief is the first cite to

19   the exhibit, and what they say is that the claimed remote

20   control device has, "entirely different functionality than,"

21   and there's a bracket, "an IP smartphone," and they cite to

22   Exhibit B-50.

23             Now, when I saw this quote in their brief, I saw

24   that little bracket.  If we go to Exhibit B-50, and this is

25   the December of 2007 supplemental response in the

1    prosecution history of the '103 patent.  It's not asserted

2    in this case, but it is a related patent.

3                And if we go to page 7 of this document, and we

4    can blow up that paragraph starting with "during."  This is

5    the paragraph that Comcast cites from.  Now, they said that

6    there's an entirely different function than an IP

7    smartphone.  I looked in this paragraph to find out where

8    this was and it's completely taken out of context, because

9    if you read the whole sentence, and this is the sentence

10   that starts, in the marketplace, which has a role in

11   determining what is a nonobvious -- what is nonobvious that

12   was reconfirmed by KSR, a remote control at a low price

13   point has entirely different functionality than a McQuaide's

14   IP smartphone.

15               Now, that is a very different quote than the

16   claimed invention, the claimed remote controls having an

17   entirely different function than the IP smartphone.  What is

18   being discussed here is a prior art IP smartphone, and

19   you'll see later in the prosecution, you'll see that the

20   actual McQuaide device is also referred to as a portable set

21   top box.  It was an all-in-one device using the set top box

22   for, and you didn't need a component of any kind.  It was a

23   mobile device that you could use as a one -- and they say in

24   the marketplace, which has a role in determining whether it

25   was nonobvious, that a control, a remote control with a low

1    point, price point has a target functionality.

2            Now, the next sentence, and you'll see this in

3    slide 23 of Comcast's slides, which is the key to

4    everything.  The sentence reads, the remote claims in, the

5    remote control claims in the companion case include positive

6    limitations that specify a data feed which is unavailable in

7    the exchange between McQuaide's IP smartphone and the simple

8    IP router to which it connects.

9            So that sentence by itself tells you that the

10   claims that are in the case, in this case include the

11   limitation that specified the elements that distinguish the

12   McQuaide IP smartphone.  It's not a disavowal of a

13   smartphone in general.  They are saying they've put in a

14   limitation in the claims themselves, positive limitations

15   that specify the difference.

16           Now, that was the first cite that Comcast relied

17   on, and you can see in the brief, they just misled or

18   misquoted, cited, took out the McQuaide smartphone, a

19   general IP smartphone, and then they left out, and you'll

20   see it in the slides as well, that the remote claims in the

21   companion case include a positive limitation specified as A

22   and B, which is unavailable.

23           The second cite they rely on goes to Exhibit

24   B-2.  This is another 2007 response office action, and this

25   one is in the '130 patent.  And if we go to page 12 of this

1    document, this is the block quote that Comcast cites on page

2    17 and 18 of their brief.  But I want to go above that.  If

3    you look at the sentence that begins, we have amended claims

4    1, 2, et cetera, and goes down from there to the bottom of

5    the page, and blow that up.

6            So what the patentee is saying here, they've

7    actually amended all of these claims, so they made

8    amendments to the claims themselves to try to get over the

9    prior art.  The first paragraph after the amendment, some of

10   the amendments are to the actual console components of the

11   claims, and they address the form, factor, et cetera, and

12   then they made amendments in the next paragraph.  The

13   amendments to the remote control claims address the

14   interface with the remote, which dramatically impacts the

15   complexity and cost of the remote.

16           Now, what the patentee is saying here, they've

17   actually made claim amendments to try to get over the actual

18   McQuaide and not giving disavowal of the smartphone.  They

19   then go on to say, the McQuaide reference, for instance,

20   incorporates in a handheld device capabilities of decoding

21   IP-TV and IP phone signals.  This is where, when it starts

22   with the word McQuaide, that is the portion that -- of this

23   paragraph that is quoted by Comcast as a disavowal on page

24   17 and 18 of the brief.

25           Now, what again catches my eye is the ellipses.

1    Now, I want to know what are they cutting out here?  And if

2    you look at what is being discussed, one, even in their

3    publication is the claims themselves are being changed to

4    overcome the prior art.  They are not giving an express and

5    explicit disavowal of all smartphones, but what cut out in

6    the ellipses in their brief is the sentence that says, and

7    it's about midway down on the far right, to resemble our

8    configuration.

9              One line down, Mr. Thomas.  There you go.

10             This was left out of the brief.  To resemble our

11   configuration, McQuaide's Figure 1 would be modified to add

12   a media center or similar devices between router 12 and

13   handheld device 10.  The native IP signals would pass from

14   the router 10 to the media center, which would render a

15   Bluetooth signal.  (Alternatively, the IP router 12 could be

16   built into the media center or similar device.)

17             That's the part that was omitted.  But what they

18   are saying in here with the remarks in the actual

19   prosecution history is that you'd have to modify McQuaide's

20   device to match the claims of what the patentee is proposing

21   with their amendment.  That is not an express disavowal of

22   all IP smartphones and there's nothing in here -- they are

23   talking about the explicit claims with those limitations are

24   different than the McQuaide set top box or remote, whatever

25   you want to call it.

1          So there's nothing in here that disavows the

2   actual -- using a smartphone or something that decodes IP-TV

3   or VoIP.  It's just not there, and it's clearly not an

4   express disavowal and an unambiguous disavowal.  In fact,

5   it's just the opposite.  It says that there are amendments

6   to the remote control interface with the remote.  Those

7   amendments are what's distinguishing McQuaide, not an

8   express disavowal of the claim scope of something that is as

9   broad as a smartphone or something that could decode.

10          And if you look a little further on into this

11   brief, that language is repeated for the very specific

12   claims that they're discussing.  Go to the next page, page

13   13, where it says, a rejection under 35 U.S.C., 102(e) of

14   claims 6, 8 through 11 and 13.  This language that I just

15   quoted from the previous page is also there.  It says, the

16   Examiner rejects most of our remote control claims under

17   102(e) specifically by McQuaide.  We have amended these

18   claims to address the interface with the remote.  We have

19   amended these claims to address the interface with the

20   remote.

21          So the actual claim language, the actual claims

22   themselves, the limitations in the claims is what is being

23   used to distinguish the prior art, not an express disavowal

24   of the scope that Comcast would have this Court believe.

25          And, once again, the language itself, if you go

1    down to the bottom of that page, it says, to resemble -- I'm

2    sorry, the bottom of that paragraph -- to resemble our

3    configuration, McQuaide's Figure 1 would be modified to add

4    a media center.

5              Now, they are distinguishing the claim language

6    in McQuaide.  They are not saying they're disavowing all

7    smartphones and not disavowing any type of functionality of

8    McQuaide.  They are saying the claims themselves as amended

9    overcome the prior art.

10             THE COURT:  What about the sentence directly

11   above that that starts out, in contrast to McQuaide's

12   handheld-connected-to-IP router configuration, our remote

13   controls interacts with something more sophisticated than a

14   simple router, and then it goes on to describe examples, and

15   all of this repeated in the passages that you just put up

16   indicate a focus on something simpler, something less

17   expensive, less costly, and the argument is that is because

18   it doesn't do the decoding.  You know, address these

19   passages not in isolation, but in the context of the

20   argument that has been made by Comcast.

21             MR. ANDRE:  Yes.  I mean if you look at the

22   example right before that, it says, in contrast to

23   McQuaide's handheld-connected-to-IP router configuration,

24   our remote control interacts with something more

25   sophisticated than a simple router, such as a set top box.

1    That's what the claims actually require.  The claims -- this

2    is an example of patent prosecution where they're amending

3    the claim to distinguish the prior art.

4           So the claims as written do exactly that.  They

5    are talking about how, for example, if we go back to our

6    slide deck, slide 8, you can see how these claims were

7    amended to say that the palm-held remote has one set of

8    functionalities and the console has the other, and in this

9    particular claim element, the console has the functionality

10   to decode VoIP to remote control devices and remove.

11          You see at that level, that focus is on the

12   console to which the remote is talking to.  So it is

13   something that, if you go back to the prosecution history,

14   that's consistent with the actual claim language.  That is

15   the argument it's making.  It's not giving an express

16   disavowal of its very broad concepts, not being able to use

17   smartphones.  In fact, everything in the specification

18   indicates otherwise.

19          If we go back to that portion of the prosecution

20   history, if you blow that up again, that focus of this

21   language is that the claims were amended to address the

22   interface with the remote which might impact the complexity

23   of the remote.  It's the interface between the remote and

24   the component or the set top box or whatever happens to be

25   the component itself.  So it is something that that is a far

1    cry from any type of express or explicit disavowal of a

2    supplementary remote.  And as it turns out, the claims

3    themselves actually say what is being claimed and where the

4    functionality occurs.

5              So if they are arguing that the remote itself

6    just doesn't do this process, a very express disavowal, then

7    there is a disavowal, that's just not the case here.  Now

8    here you want to have a low cost component on a remote, or a

9    low cost remote, exactly what we're talking about in the.

10   You know, the remote, you can get your standard remote that

11   you talk into or you can get an app, usually given away for

12   free.  It is a low cost remote.  Where it sits and what kind

13   of component it sits on is irrelevant, but that being said,

14   there's nothing in the, you know, the claim, the

15   specification or the prosecution history that would say that

16   the patentee intended and expressly did disclaim, as Comcast

17   had argued, that the remote cannot have a, cannot be a

18   smartphone, A, and, B, cannot be a co-complex data stream,

19   especially when the prosecution, I mean the specification

20   states otherwise.

21             So the last exhibit that Comcast relies on is

22   Exhibit B-4, and B-4, they talk about in their brief on page

23   18, they cite B-4 to say that NexStep again inside the

24   claimed invention did not include elaborate decoders.

25             If you go to page 12 of this document on Exhibit

1    B-4 at the bottom -- I'm sorry.  It starts on the technology

2    discussion.  The actual quote starts on page 13, the very

3    next page, at the first full paragraph.  Adding a new device

4    that does not include elaborate decoders offers new consumer

5    features at a favorable price point.  That is not an express

6    disavowal of the invention.  This is a discussion on

7    technology.  It has nothing to do with the claim language

8    itself.

9              So what we're seeing in the prosecution history

10   estoppel argument is a lot of innuendo and what is a

11   real tortured construction of what an express disavowal,

12   because if you look at the actual prosecution history that

13   Comcast cites to, there is -- there simply is no disavowal

14   at all.

15             Does Your Honor --

16             THE COURT:  You know, you've highlighted a point

17   that seems to pretty much affirmatively say that it does not

18   include elaborate decoders, so what legal authority cases,

19   other information is there out there to record to not accept

20   that express disavowal?

21             MR. ANDRE:  Your Honor, it's not a disavowal of

22   scope when you say there is a -- that language itself I just

23   pointed out.  It's not talking about the claimed invention.

24   It's talking about the technology in general.  The actual --

25   if you read the entire context of the technology discussed,

1   and they are talking about the McQuaide technology, and

2   there's nothing in there that talks about the claimed

3   invention.

4            So if you look through the entire prosecution

5   history, Mr. Frankel will touch on it a bit more as we get

6   into the next claim term, you know, there was an idea that

7   what McQuaide was teaching was the all-in-one box, and if

8   you look at it, they call it a portable set top box.  That

9   something that did not require a console at all.  And so the

10  distinction here is you have an entire set top box.  Every

11  bit of the programming that's going to be done for the

12  system is going to be done on that set top box.  What the

13  patentee was talking about was an input/output platform that

14  relied onset top box.

15           Go to page 14 of this brief.

16           They are actually talking about their remote.

17  It says, our remote -- the first full paragraph.  Our remote

18  input/output platform relies on a set top box, a home media

19  player or another relatively expensive master system that

20  already has extensive computing power to do the heavy

21  lifting.

22           So and it goes on.  As of decoding IP-TV, IP

23  phone, and similar highly encoded media sources.  As a

24  result, the remote input/output platform becomes something

25  entirely different from a portable set top box.  Now, that

1    is not an express disavowal.  It's saying you cannot have

2    the functionality on a phone, on a smartphone.  It does not

3    say that express disavowal, you don't have a, you can't have

4    any additional functionality on remote as well.  The claims

5    themselves require, and Your Honor can see each one of the

6    claims we cited to, requires a remote and another component,

7    or master slave relationship.

8              And so we're not trying to get around that

9    requirement.  But to put a negative limitation in an express

10   disavowal of their remote or upon another remote or a remote

11   controlled device, it's just not there.  What they are

12   saying here is the entire platform relies on the set top

13   box, so that's a positive limitation.  It's not a negative

14   limitation saying the remote doesn't have it.

15             THE COURT:  All right.  Thank you.

16             MR. ANDRE:  Now, if you have no further

17   questions, I will turn it over to the Comcast counsel.

18             THE COURT:  I will hear from Comcast.  Thank

19   you.

20             MR. LEE:  Your Honor, this is Bill Lee.  Can you

21   hear me clearly?

22             THE COURT:  Yes, Mr. Lee, I can hear you

23   clearly.  Thank you.

24             MR. LEE:  Thank you, Your Honor.  Your Honor, I

25   will do both our introduction and respond on both of the

1    first two claim terms.  I will try to get it done in

2    30 minutes to keep our side on time.

3              If I take you to our slides, which Mr. Lee will

4    put up on the screen now and take you to the second slide,

5    the cases Mr. Andre said involve nine patent and technology

6    related to the remote controls, customer service and home

7    electronic systems.

8              Mr. Andre provided a little bit of a summary of

9    invention story.  I'm not going to respond because, first,

10   we don't think it's relevant to claim interpretation and the

11   response is subject to the protective order and the hearing

12   is public.

13             As described in our briefing, Comcast asserts

14   nine patents equate the subject matter of their claims.  If

15   I move to slide 3, we call the first group of six patents

16   the tether patents.  They all concern a remote control that

17   must be by the express or the patent tethered to a master

18   device or master console in order to operate as designed.

19             If I move to slide 4, Your Honor, the second

20   group of patents are the concierge patents.  These patents

21   involve a concierge device, as Your Honor knows, used in

22   customer service resources.

23             And if I move to slide 5, the final patent is

24   called the enrollment patent, because it relates to

25   enrolling home electronics into a home system.

1          As the record before Your Honor demonstrates,

2    the application for each of these patents was made in a very

3    crowded field of technology and art.  The patents themselves

4    demonstrate that.

5          As a result, NexStep was only able to obtain

6    very specific and very narrow claims, and critically, Your

7    Honor, was only able to obtain those narrow claims, those

8    specific claims by expressly representing in the

9    specification, but also in the file history, just how the

10   specific invention claims were different from the, from this

11   prior art.  It makes the intrinsic evidence particularly

12   critical here.  The patentee cannot reclaim what it

13   relinquished in prosecution by requesting plain meaning

14   Markman construction, which has become sort of the

15   plaintiff's resort of the day.

16         As we know the Court knows, a patent

17   specification is largely indeed, often almost entirely in

18   the original patent application.  The prosecution history by

19   definition occurs chronologically after the specification

20   has been filed as an application.  Here, the focus of my

21   argument on the first two claims will be on the intrinsic

22   evidence and putting the specification, particularly those

23   post filings, post applications.

24         As Mr. Andre mentioned, if I move to slide 6,

25   the parties have narrowed their disputes to six claim terms,

1    and as I hope Your Honor will see when we finish our

2    argument, the plaintiff is trying to broaden each of those

3    six terms beyond what they originally described as its

4    invention and beyond what they explicitly said to the Patent

5    Office.  We are asking only that the plaintiff be held to

6    its express representation and that it be held to what it

7    had provided to the public with public notice.

8              I will address the first two terms.  Ms. Sooter

9    will address the next two and Ms. Petty will address the

10   last two.

11             So if I move, Your Honor, to the two terms, and

12   if I move to slide number 7, get myself there, and then on

13   to 8.  As I said, Your Honor, the tether patents were six

14   asserted patents which all share a common specification.

15   They are titled tethered digital butler consumer electronic

16   device and method, and they are titled that for a good

17   reason.

18             If we walk through, and I'm going to try to do

19   it quickly, both the background of the invention describing

20   the abundant prior art, the statement specification of what

21   the invention was and what it was not and then look at how

22   that was amplified and expressly represented in the file

23   history, I hope that we'll demonstrate that our claim

24   interpretation is the one that makes more sense.

25             So if I turn to slide number 9, the background

1    of the invention states expressly that smartphones are

2    powerful standalone devices that offer many features.  They

3    are robust, they have many components, they're powerful.

4    They are, as the background of the invention states,

5    "untethered," and that is a quote, "because they don't

6    require another device to provide these resources."

7             But the problem with those smartphones, as the

8    patent expressly states is, they're "overbuilt and too

9    expensive."

10            If I turn to slide 10, the patent tells us in

11   the summary of the invention how this claim invention in

12   this crowded field of prior art is different.  It's

13   different because it's a tethered digital butler to consumer

14   electronics products.  It is different because it involves a

15   palm-held device that depends upon a console.  That is why

16   the device, the remote controlled device, the palm-held

17   device is tethered to the console.  That is depicted

18   graphically in the bottom right-hand side of slide 10

19   graphically.  This is in comparison to a smartphone which

20   the patent tells us is not tethered and doesn't require

21   tethering to its resources.

22            If I move to slide 11, the patent goes further.

23   The patent expressly states that the remote control uses the

24   logic and resources of the console to accept access

25   resources the remote control itself does not have.  That's

1    why it's tethered, that's why it can be less complicated.

2    That's why it's less expensive.

3          And that's why if I turn you to slide 12, the

4    patent states expressly that the benefit of this tethering,

5    tethering a remote control to the robust console is that the

6    remote control can be low cost and it can use and depend

7    upon the processing power of the console.

8          Contrary to what Mr. Andre was suggesting, the

9    patent expressly states "that this tethering" runs against

10   the trends and teachings of the electronics industry and

11   particularly against the trend towards more powerful

12   smartphones.

13         Now, this is a statement in the specification of

14   each of the tether patents.  It is a statement that was

15   amplified during the course of the file history, and if I

16   turn you to slide 14, Your Honor, it is the key to the

17   competing claim interpretation of the parties.

18         This slide 14 states that those are the same as

19   Mr. Andre's slide demonstrating the claim interpretation.  I

20   would say this at the outset.  The idea that palm-held

21   remotes and remote control devices are different and require

22   a meaningfully different claim interpretation is belied by

23   the slide itself, and I think I will show you in a minute or

24   two that the file history doesn't support that at all.

25         If I turn you to slide 15, Your Honor, the

1    dispute really reduces to this.  Did NexStep, through its

2    statements in the prosecution history and specification,

3    define the palm-held remote, the remote control device to

4    exclude smartphones as we suggest?  We suggest that they did

5    unequivocally.

6             On slide 16 we have claim 10 of the '130 patent

7    and claim 1 of the '753 patent.  Claim 30 of the -- claim 10

8    of the '130 patent includes the palm-held remote limitation.

9    The claims of the remaining patents use the term remote

10   control device.  We'll be able to demonstrate to you that

11   they are used interchangeably and the file history of the

12   '130 patent demonstrates that clearly.

13            If I turn to slide 17 and 18, Your Honor, we

14   have Your Honor's admonition not to repeat the obvious claim

15   interpretation principles, so let me just make two points on

16   these two slides.

17            The first is Mr. Andre repeatedly used the term

18   express disavowal, and there is a concept of an express

19   disavowal of coverage.  But as the Federal Circuit said this

20   year in the Apple case, even when statements in the

21   prosecution history don't rise to the level of a disavowal,

22   they inform claim construction.  That only makes common

23   sense.  If the purpose of the file history is in part public

24   notice under Section 112, those statements, whether

25   disavowals or otherwise, indicate a claim construction and

1   they should.  Here, we believe that the statements are

2   disavowals, but even if they weren't, they still indicate

3   Your Honor's claim interpretation.

4          The second point I will make is on slide 18, and

5   that is the suggestion that somehow there is something wrong

6   with a negative limitation and that simply isn't correct.

7   The best indication I can give you is Judge Andrews' claim

8   interpretation in the Bayer case decided about two years ago

9   where he construed a term, and because of the prosecution

10  history, he included a negative limitation expressly.

11  We've highlighted it here.  "Where conjugation was not

12  random."

13          Negative limitations may not be the most common

14  thing Your Honor sees, but they are completely acceptable,

15  and as the Bayer case suggests, when there is a prosecution

16  history that by disavowal or otherwise suggests that a claim

17  term cannot cover something, the claim interpretation should

18  say so.

19          Now, if I turn to slide 19, Your Honor, I'm

20  going to very quickly move through the prosecution history

21  on a chronological and I hope disciplined basis because I

22  think it's the answer to the argument that Mr. Andre made to

23  you.

24          So let me say one thing by way of introduction.

25  There was some question whether we had used brackets or

1    ellipses to misrepresent or misstate the file history.  I

2    think Your Honor will see that we have not.  In particular,

3    Mr. Andre referred to 817 of the joint claim construction

4    statement and to a bracket that we used.  We did use a

5    bracket there, Your Honor.  We used a bracket to take out

6    the word "a," which was a typographical error, and rendered

7    the sentence nonsensical, not commonsensical.

8              So let me take you through the file history.  I

9    will do it quickly.  And I'm going to focus on --

10             THE COURT:  Let me interrupt you there if you

11   don't mind, please.  It would be helpful to me in addressing

12   Mr. Andre's comments that address this issue of amendments

13   to overcome prior art versus actual disavowal, and he made a

14   distinction again -- you're about to get into a McQuaide

15   reference, and he made a distinction about representations

16   about the amendments to the claims as opposed to construing

17   them as disavowals.  So address that, please, as you go

18   through the file history.

19             MR. LEE:  Sure, Your Honor.  First let me

20   address it legally.

21             For claim construction purposes, as the Apple

22   cases suggest, this is a distinction without a difference.

23   You can have disavowals that are not related in any way to a

24   claim amendment.  There is no doubt about that.  You can

25   have disavowals that are related to a claim amendment.  You

1    also can have prosecution history statements that are not

2    related to an amendment, that don't rise to the level of a

3    disavowal, but still educate the meaning of a claim term,

4    and you can have prosecution history excerpts where there is

5    an amendment, there is an explanation of the amendment, and

6    that educates the correct claim interpretation.  Whichever

7    of those four buckets this falls into, Your Honor, these

8    statements were clear, they were unequivocal, they were made

9    as you will see in a second to obtain allowance, and the

10   public notice function, Section 112 would say that is

11   enough.

12           And a claim interpretation that would not

13   address them, we would suggest wouldn't be correct, but I

14   will be able to show you in a second, Your Honor, that

15   adopting their plain meaning claim interpretation would

16   cover precisely what McQuaide describes and precisely the

17   words remote control, the term Mr. Andre said anyone would

18   understand if they had children, my grandchildren.  That is

19   what McQuaide describes in black and white in a figure by

20   those terms.

21           If you would accept their claim interpretation,

22   you would be covering precisely what was in the prior art,

23   precisely what they said was different, and therefore

24   whether the statements were made in connection with

25   amendments, in connection with argument, some of them were

1     at least the same consequence.

2              So, Your Honor, if I move to slide 19, this is

3     an excerpt from the file history, and I'm going to talk

4     about the parent patent, which is not asserted in this case,

5     and the '130 patent, because they were prosecuted as

6     companions simultaneously.  So the exhibits before Your

7     Honor have statements made in both and statements made in

8     one, sometimes referred to the other prosecution.

9              During the course of the examination, as Your

10    Honor and Mr. Andre discussed, of both the '130 patent and

11    the parent, the Examiner rejected the pending claims based

12    upon McQuaide, and the Examiner was clear.  It said, we're

13    rejecting claim 9 there, pending claim 9, because McQuaide

14    discloses a remote control.

15             Now, the claim pending of the '130 patent and

16    the parent was a palm-held remote, but the Examiner said

17    McQuaide discloses a remote control.

18             If I turn to slide 20, Your Honor, on that same

19    day in the '130 patent prosecution, the Examiner rejected

20    the claims pending there for the same reason, because

21    McQuaide discloses a remote control.

22             So what was McQuaide?  If I turn Your Honor to

23    claim 21, McQuaide tells us precisely what it is.  And I

24    will wait until it comes up on the screen.

25             Okay.  So can we go back to slide 21, which has

1    the front of the McQuaide -- yes, there we go.  My

2    apologies, Your Honor.

3           This is the first page of the McQuaide

4    application.  As Your Honor will see, it describes -- it

5    discusses expressly a handheld remote personal communicator

6    and controller.  That remote control device can receive

7    Internet protocol signals and other video, audio and

8    graphical time stamps and it can process them.  It is that

9    remote control device that was the basis for the Examiner's

10   objection.  And if Your Honor sees the figure that is small

11   on the cover of the patents, we're going to come back to

12   that Figure 1 of the patent.

13          What happened next?  NexStep interviews with the

14   Examiner, and on slide 22 is a response that was filed by

15   NexStep after the interview.  And NexStep says in

16   December 2007, we had the interview.  We discussed the

17   remote control claims, and we discussed them both in the

18   parent application and the co-pending '130 patent

19   prosecution.

20          What does NexStep say in response to that

21   interview and those discussions?  Let me turn you to slide

22   23.

23          NexStep makes a specific effort to distinguish

24   the remote control claim scope from the '130 patent, saying

25   that the remote control has a low price point and entirely

1    different functionality from McQuaide.

2         Now, Mr. Andre faults us for not highlighting

3    what is around that sentence.  What's around that sentence

4    doesn't change the meaning at all, and, in fact, if Your

5    Honor considers what the application had said on the

6    subject, what was before the Examiner, McQuaide, the fact

7    that NexStep itself had characterized McQuaide as a

8    smartphone, smartphones having been distinguished

9    application, this sentence makes perfect sentence.

10        But if you needed any reassurance, we needed any

11   reassurance, at slide 24, NexStep made a fuller

12   amplification of the representations in the '130 patent

13   prosecution, and the patent prosecution is most relevant to

14   us, and it elaborated on the differences between McQuaide

15   and the claimed remote control.

16        Now, Your Honor will see that the thing being

17   distinguished is McQuaide.  The limitation being referred to

18   is a remote control.  It doesn't say palm-held remote.  It

19   doesn't say palm-held remote control.  NexStep itself

20   equated the palm-held remote, which was in the limitations

21   of the '130 patent, with remote control, and it said

22   expressly that there are differences between McQuaide and

23   NexStep.  It says, the McQuaide remote control incorporates

24   in a handheld device capabilities of decoding IP-TV and IP

25   phones that would be VoIP signals.  As a consequence, it

1     requires, and we expressly say, very expensive handheld

2     phones.  It then says how ours is different.  Our remote

3     control is much simpler than McQuaide's device.

4                Now, these statements are made in parallel and

5     taken together are pretty clear in what they communicate.

6     The suggestion, if I take you back to slide 23 just for a

7     second, that somehow we misrepresented the meaning of the

8     first statement in the co-pending parent application that's

9     on slide 23 when the other statements are read just isn't

10    true.

11               So if I take you to slide 25, the discussion

12    goes on, Your Honor.  Notwithstanding these representations,

13    the Examiner still rejected NexStep's claims in the '130

14    patent prosecution and it did so expressly based upon the

15    fact that McQuaide had, and I quote, "a palm-held remote

16    (see Unit 10 from Figure 1)."

17               Figure 1 is on the right-hand side of your

18    screen.  Item 10 from Figure 1 is on the left-hand side of

19    the figure.  It is the remote control device.

20               Now, if remote control device has a plain and

21    ordinary meaning, it is what one that any one of us would

22    know as night follows day and the remote control device is

23    going to cover McQuaide, that's exactly the opposite of what

24    NexStep says, and they continue to say that.

25               If I take you to slide 26, in their May 26, 2008

1    response, in an effort to address that rejection, they

2    doubled down and said we're different from McQuaide.  We are

3    less expensive.  We are less complicated.  We rely upon the

4    console for the remote processing.  This to quote the file

5    history, which is reiterated within the specification, says,

6    it runs against the trends and teachings and runs against

7    the use of powerful smartphones.

8              Those arguments distinguishing McQuaide,

9    McQuaide's remote control, McQuaide's smartphones are

10   precisely what led to allowance, and that's on slide 27,

11   Your Honor.

12             And, again, to the extent that NexStep is now

13   suggesting to you that handheld remote and remote control

14   devices are sometimes different terms, the '130 patent has

15   only palm-held remotes.  Even the Examiner after this back

16   and forth that we just described to you said that the basis

17   was that the claim limitations are different and different

18   in the sense they had different remote control devices

19   performing.

20             Now, if I move to slide 28, we would suggest

21   there's no need to address the extrinsic evidence because

22   the intrinsic evidence simply viewed chronologically is, we

23   suggest, compelling, but we submitted the declaration of Dr.

24   Chatterjee, who testified or declared that one of ordinary

25   skill in the art would understand McQuaide disclosed a

1    remote control device in a smartphone.  The most important

2    thing here is Dr. Selker, who filed a declaration for

3    NexStep, does not address the file history at all in the

4    declaration.

5              Now, Your Honor, in the interests of time, the

6    next series of slides includes portions of the specification

7    that basically say the same thing and provide the foundation

8    for the subsequent representations that we just discussed.

9    So on slide 29, we have a quote from the patent that

10   describes the present invention as tethered as less

11   expensive as contrasted with smartphones.

12             On slide 30 we have the portion of the

13   specification that says two things, that tethering is what

14   allows you to have the low cost, less complicated remote

15   because the remote doesn't have to have the resources, and

16   that is particularly running against the trend against

17   smartphones.  And the specification goes on on slide 31 from

18   that distinction.

19             So what does NexStep say in response?  And they

20   make fundamentally three arguments, which Mr. Andre has

21   made, and I will go through each of them quickly because I

22   don't think they change the correct claim interpretation.

23             The three arguments are summarized on slide 32,

24   but let me turn to the first one, which is the prosecution

25   history statements are allegedly limited to claim 10 of the

1    '130 patent.  I think, Your Honor, this relates to your

2    question about Mr. Andre's statement that some of the

3    statements were made in connection with defendants and some

4    of them weren't.

5              As Your Honor has seen, the statements were made

6    repeatedly broadly in a different context, but a simple

7    answer would be they're not limited to claim 10 of the '130

8    patent, which is the argument made to Your Honor in the

9    briefing.

10             On slide 33 we have an excerpt from the file

11   prosecution history of the '130 patent, and you can see it

12   says, we have amended certain claims, and then it says, here

13   is how McQuaide is different.

14             Going back to Your Honor's question, the fact

15   that there were amendments to the claims demonstrates that

16   we're not just talking about claim 10.  The fact that the

17   McQuaide argument is once again comparing the capabilities

18   of the McQuaide smartphone or handheld device and the claims

19   on handheld remote is a demonstration that the arguments are

20   not limited to the claims.

21             Argument number two.  If I turn to claim 34, and

22   Your Honor has Mr. Andre's presentation.  I think the

23   argument is that, well, the patents allegedly disclose some

24   remote control devices that decode complex data streams.

25   They actually don't, Your Honor.  And, again, these

1  statements in the specification that Mr. Andre went through

2  in column 3 and column 7 in Figure 7 are all statements that

3  were made in the application and then amplified and

4  explained in the prosecution history.

5        So the first is on the screen now, and it refers

6  to this portion of the specification describing features

7  adaptable to voiceover IP and/or video phone operation.  And

8  there's a suggestion that somehow because you're referring

9  to those features, you have disclosed, suggested that the

10  remote control device can cause a complicated data stream.

11  That is not what the statement says.  It merely says that a

12  microphone which can be used for voiceover IP, and no one

13  contests that, can do other things, such as dictation.  That

14  is true and not really contested.

15        What's important is nowhere in that text does

16  the specification say that the remote control is decoding

17  complex data information like voiceover IP or IP-TV itself,

18  and that's because the patent, it cares that the console is

19  doing that and the prosecution history confirms it.

20        NexStep, if I go to the next slide, slide 35.

21  The next variation of this argument is a suggestion that

22  because there was affection scale Xscale processor, an Intel

23  Xscale processor described in the patent, that that somehow

24  suggests a remote control device must decode complex data

25  streams.  The answer is there is nowhere in the patent that

1  describes the remote control with the Intel processor or

2  without as processing complex data streams, and as

3  Chatterjee explains, the mere fact that the patent describes

4  the use of an Intel Xscale processor tells you nothing about

5  the manner in which the remote is using that Intel Xscale

6  processor.  And, again, Dr. Selke didn't respond.

7           So on the second argument, Your Honor, each of

8  the two examples Mr. Andre provided to you, nowhere does the

9  specification describe the remote control as processing

10 complex data streams.  In fact, everything has been the

11 opposite direction, and if we had any doubt, the file

12 history tells us quite clearly that the remote control

13 device, a handheld remote, cannot do that.

14           THE COURT:  Let me interrupt there before you

15 move on.  I just wanted to be clear I'm understanding your

16 argument.

17           Is it Comcast's position that the fifth

18 embodiment identified in column 3 that plaintiff brought up

19 and as well as Figure 7, is it Comcast's position that they

20 don't encompass a smartphone?

21           MR. LEE:  Your Honor, the answer is those

22 examples that Mr. Andre referred you to are not examples of

23 the remote control having the robust functionality of a

24 smartphone.  So I think the answer to Your Honor's question

25 is yes, but there is neither of those two examples, neither

1    of those two portions of the specification describe a remote

2    control device with those robust functionalities and

3    therefore they can't cover a smartphone.  And, Your Honor,

4    if they did, if those two examples did, and if NexStep

5    really believed they were examples disclosed, smartphones

6    disclosed, smartphones with that complicated functionality,

7    they never could have made the representations they made

8    about McQuaide.  It wouldn't have been possible.

9            The last argument, Your Honor, is claim

10   differentiation, and I think we can deal with this quickly

11   if I go to slide 37.

12           I think the claim differentiation argument is

13   applied as a legal matter and a factual matter.

14           Factually, if I turn you to slide 38, as I

15   understand their argument, their argument is some claims,

16   some claims explicitly require that the remote process audio

17   feed.  Therefore, other claims that don't expressly recite

18   that limitation aren't intended to be so limited.  Again, if

19   that were true, it would be inconsistent with the long run

20   of what they represented to the Patent Office, but it's not

21   factually true.

22           If I took you to slide 38, Your Honor, each of

23   the different limitations, each of the different claims

24   recite in some manner or other that the console device, the

25   master device, is performing audio or video processing.

1    This slide just has four examples.  So factually, the claim

2    differentiation argument is simply incorrect because the

3    claims do require that the console device perform audio or

4    video processing.  That makes sense given what the

5    specification says is the invention.

6            And, in any event, legally, Your Honor, if I

7    turn to slide 39, even if that weren't true, even if it

8    weren't factually true, claim differentiation can't enlarge

9    on the meaning of a claim term, specifically claim terms

10   that have been specifically explained in the specification

11   of the limitations imposed by the prosecution history.

12           So if I turn to slide 4, Your Honor, at the end

13   of the day, the claim construction process and the claim

14   interpretation is supposed to reflect the requirements of

15   Section 112, the requirements that claims distinctly claim

16   what is claimed, and that the collection of the intrinsic

17   evidence provide the public with notice of what the patents

18   covered.  We think it would be very difficult, if not

19   impossible, to read this file history and the repeated

20   references to McQuaide, smartphones, and the repeated

21   efforts to distinguish remote control devices that have

22   robust functionality incorporated into them and conclude

23   that you are satisfying the public notice function of

24   Section 112.

25           Thank you, Your Honor.

1          THE COURT:  Thank you.  Let me turn back and see

2     if Mr. Andre has any further comments on these two terms on

3     behalf of NexStep.

4          MR. ANDRE:  Thank you, Your Honor.  Just a few.

5          As Comcast just discussed, in order for there to

6     be prosecution history disclaimer, there has to be a clear

7     and unmistakable disavowal.  And when we talk about that,

8     the Federal Circuit held even last year in the Continental

9     Circuit case versus Intel is that the patentee has to

10    describe the claim terms in a way to overcome the prior art,

11    actually give a definition of the claim term, disavowal of

12    the claim term itself.  In other words, you have to describe

13    the remote to overcome the prior art.  That's not what

14    happened in this case.

15         And counsel kept saying there's a repeated

16    remark in the prosecution history.  If we go back to B-50

17    and B-2, these are remarks that were submitted one day apart

18    in two different patent applications.

19         Go back to B-50 and go to page 7.  This is, this

20    paragraph starts with during, the bottom of that paragraph,

21    when it says the marketplace which has a rule determining

22    what's not obvious.  A remote control at a low price point

23    has an entirely different functionality than a McQuaide IP

24    smartphone.

25         That's the segment they rely on.  The part they

1   omit is the remote claims in the companion case, that's what

2   we're talking about the, the claims themselves include

3   positive limitations that specify a data feed which is

4   unavailable in the exchange between McQuaide's IP smartphone

5   and the simple IP router to which it connects.  They have

6   claim language in there.  They are not using express

7   disavowal of remote control or palm-held remote to overcome

8   the prior art.

9           And the document filed the next day, Exhibit

10  B-2, go to page 12 of that.  And you see they have made

11  amendments.  It says, the amendments to remote control

12  claims address the interface with the remote which

13  dramatically impacts the complexity and cost of the remote.

14  Once again, they're overcoming the prior art not by saying

15  remote means X or Y.  They are overcoming it by limitations

16  in the claim language itself.  That is not a clear and

17  unmistakable disavowal, and it's clearly not what the

18  Federal Circuit outlined in the Continental Circuits case

19  just a year ago.

20          Those are the only two statements in the

21  prosecution history that they are relying on that really

22  talk about the claims themselves, so I don't think there's a

23  repeated representation in the prosecution history that says

24  the remote control means X.  What it says in both instances

25  is that amendments were made, claim limitations were added

1    to the claim that distinguish the prior art.  That is a big

2    difference than the prosecution history disclaimer.

3              Unless Your Honor has any questions, I will end

4    it there.

5              THE COURT:  Nothing further.

6              Any further comments, Mr. Lee, on these two

7    terms?

8              MR. LEE:  Nothing further, Your Honor.  Thank

9    you.

10             THE COURT:  All right.  Shall we then move on to

11   the term for control device and then after that after that,

12   take a brief break?

13             MR. ANDRE:  Your Honor, Mr. Frankel will be

14   doing that term for NexStep.

15             THE COURT:  Very well.  I'm ready to proceed.

16             MR. FRANKEL:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. FRANKEL:  If we could have 14, please.

19             Before I get into this term, I want to point out

20   again that we've talked about three different terms here --

21   palm-held remote, remote control device and control device.

22   They are different terms, they're in different patents,

23   they're in different claims.  They issue from different file

24   histories where different prior art was overcome making

25   different arguments, and everything that you've heard so far

1   from Comcast has been limited to the palm-held remote term

2   for the '130 patent file history.  There has been nothing

3   from the file history with remote control device patents and

4   there has been nothing from the file history for control

5   device.  And we did agree with Comcast to discuss terms 1

6   and 2 together in presenting the issue to the Court, but

7   part of that agreement was that there was no admission terms

8   should be construed the same way, and that applies equally

9   so to control device even though Comcast has proposed the

10  same construction for all three terms.

11          So we really do need to look at each of these

12  terms individually and see if there has been, particularly

13  since Comcast is relying so heavily on disavowal, that

14  there has been no disavowal with respect to any of the

15  terms, but in particular here, for term 4, control device,

16  all of the arguments that Comcast has made so far do not

17  apply to term 4.  They're from a different file history,

18  different claim limitations, different prior art and

19  different arguments.

20          And there was nothing in the file history for

21  this term that talked about, you know, cheap devices or

22  anything like that, so none of those arguments would apply.

23          It's also -- one of the terms that the parties

24  have agreed on is control device.  Plain and ordinary

25  meaning, that's a device that's controlled by another

1    device, and a control device also should have its plain

2    and ordinary meaning.  It's a device that controls a control

3    device.  That's really all that those two terms are meant

4    to provide, that one device is controlling the other.

5    That is not to say that there isn't an invention here.

6    There is.

7                If we can go to the next slide, please.

8                Each of the terms in this patent that use

9    control device specify a very complex and specific

10   relationship between the control device and the control

11   device, and that's all the limitations that are set out

12   here.

13               So it's not the -- if we could go back, please,

14   one slide.

15               You know, the key dispute is that Comcast is

16   trying to readout a smartphone or a universal device from

17   falling within the scope of control device, but there's

18   nothing in the claims that's inconsistent with the

19   smartphone or universal device serving as the control device

20   to control the control device.

21               So if we could go back to slide 15, please.

22               What this claim is really talking about is using

23   unique identifiers both in the control device and in the

24   control device to register the devices and the home system.

25   So Dr. Stepanian's idea was that in homes of the future,

1    there would be many electronic devices and advanced

2    electronic devices that should all be able to seamlessly

3    integrate, and his idea was that there would be somewhere a

4    central database, and if you brought a new device home and a

5    control device, like a new TV, and it might come with a

6    controlling device, that they would each have an identifier

7    and it would then be what is used to look up information

8    about that device from some kind of central database.

9               If we could go to the next slide, please.

10              The specification of the '964 patent makes very

11   clear that the control device can be a complex device that's

12   not limited in any way.  And here are some of the quotes

13   that we pulled from the specification that are also in the

14   brief.  They talk about the control device being

15   programmable, it can have a display, it can have menus, it

16   can have control codes, it can have input sensors, it can be

17   used to make support calls either by a telephone call.  It

18   can do video camera calls, so you can -- if you are having a

19   problem configuring your TV, you can have a video conference

20   with the support center and they can help you configure the

21   device.  It can even annoyingly, perhaps for the customers

22   in the bottom quote, it can even be used to provide

23   advertisements.  So this, what's described here is a very

24   robust device that actually sounds quite a bit like a

25   smartphone.

1          And, Mr. Thomas, if you could pull up the '964

2     patent, that's Exhibit 8-A.  And if we could go to column 3,

3     please, at lines 45 to 50.

4          The inventors here did something that's pretty

5     rare.  I actually don't usually see this in most patents.

6     He really wanted to go to lengths to emphasize the fact that

7     the inventions were going to be defined by the claims

8     themselves, not by examples in the patent.  And he says

9     here, preferred embodiments are described to illustrate the

10    technology disclosed, not to limit its scope, which is

11    defined by the claims.

12         So here the specification supports that the

13    control device -- and, by the way, this statement is in all

14    of the patents at issue in the case.  He really wants to

15    say, I'm going to give you some different examples of my

16    invention, but the invention should be defined by the

17    claims, and I don't want these examples to be used to try

18    and narrow what's actually stated in the claims.

19         If we could go back to slide 16, please.

20         So, again, we have a robust control device.  It

21    can have a screen, it can have control menus, it can be

22    programmable, it can make telephone calls, it can make video

23    calls, and it can display advertisements.  So that is very

24    much consistent with some kind of universal device or a

25    smartphone serving as the control device.  Comcast's

1    construction would read out all of these embodiments, which

2    already tells us it's an incorrect construction and it's

3    inconsistent with the claim language as well.   The claims

4    don't say anything that would preclude a universal device or

5    a smartphone from being a control device.

6                    If we could go to the next slide, please.

7                    One of the arguments that Comcast made in its

8    briefing is that there's no difference between the concierge

9    device and the control device, and that is incorrect.

10   There's a process here where the concierge device

11   coordinates the integration of the control device and the

12   control device is the home environment.   That is what is

13   discussed in the claims, that the control device and the

14   control device provide their identification information and

15   then the concierge device working with the database can sync

16   everything up together.   So that's the distinction between

17   the concierge device and the control device both in the

18   specification and in the claims.   It's not that the control

19   device has to be a simple, dumb device in contrast to the

20   concierge device.

21                   So really what Comcast has to rely on here is

22   claim disavowal to try and rewrite the claims from what the

23   inventor intended.

24                   Next slide, please.

25                   Now, again, all of the arguments that we made

1    previously were limited to the '130 patent.  They do not

2    fall within the scope of the '964 patent or any of the other

3    patents here.

4              And let's go to Exhibit B-37, page 15.  And if

5    you can zoom in on the bottom half.

6              So, you know, here what the applicant is saying

7    in distinguishing the reference as a prior argument

8    regarding application of Maymudes to these claims remains

9    unanswered.  Each and every argument that the applicant

10   makes throughout the entire file history of all of the

11   patents, but including this patent, is always tied to the

12   claim language.  They were very careful and deliberate to

13   avoid any disavowal.  It's always specific to specific

14   limitations.

15             And if we look at the last paragraph, he says,

16   if you read this application and the Maymudes reference,

17   there's a different allocation of roles and messages

18   exchanged among devices, and then he says, we should be able

19   to find on-boarding subject matter in this application.

20             So this claim is not about what video or audio

21   signals are being decoded by the remote versus another

22   device.  It's about this on boarding process, which is how

23   do you identify the control device and the control device?

24   And what the claims talk about is using a unique identifier

25   for each that is used to identify the devices.  That concept

1    is not Maymudes.

2              If we could go to the next page, please.

3    So, yes.  If you could zoom in on that first paragraph,

4    please.

5              So here the applicant says that the office

6    action overlooks a limitation added by amendment requiring

7    that capabilities of the control and the controlled device

8    be determined from settings accessed using a unique

9    identifier, and that emphasis, the bold and underline is in

10   the original, in the first and second enrollment signal.

11             This limitation was overlooked even though it

12   was a focus of our most recent interview.  Instead of

13   using a unique identifier to determine the capabilities,

14   Maymudes relied on the control device to report its

15   capabilities.

16             So the distinction that's being made here over

17   the prior art is very clear, that Maymudes, if you bring in

18   a new control device, it has to provide information about

19   its own capabilities, and in contrast the claims have a

20   different concept, which is that the device provides a

21   unique identifier.  It says, on XV7, and then that

22   identifier is used in a database to look up the device, and

23   that's how the system learns about the control device and

24   the control device.

25             So the key points are that the distinctions over

1    the prior art are based on the express claim language.  It's

2    the use of this unique identifier, and that has nothing to

3    do with Comcast's proposed construction.

4                 If we could go back to slide 14, please.

5                 Here, Comcast asked the Court to limit control

6    device to a simple apparatus, not a universal remote

7    control, not a smartphone.  There's nothing in the file

8    history that would limit control device in that way.

9                 Now, Comcast makes some references to some

10   arguments that the applicant makes about a switch being the

11   control device, but just to be clear, there are specific

12   claims that are limited to switch, and those claims, the

13   claims will say that the control device is a switch or a

14   simple switch, but that's not limiting control device as a

15   whole.  That's just applying the specific claims.

16                 THE COURT:  While you pause, let me ask my

17   question.  Where in the patent specification is a control

18   device characterized as the smartphone, a universal remote,

19   or a device capable of complex processing?

20                 MR. FRANKEL:  If you could go to slide 16,

21   please.

22                 These aren't the only quotes, Your Honor, but

23   they show again it's a programmable device, it has a

24   display, it can make telephone calls, it can make video

25   calls, it can access support services, you can stream video

1    of the control device if it's not functioning properly when

2    contacting the sports center, and it can display

3    advertisements, so those are all the robust features that

4    one could have in a smartphone.

5           But, of course, as the Court knows, absent an

6    express negative limitation for a device to satisfy the

7    control device limitation, it would just have to meet each

8    of the elements of the claim.  There's nothing -- if we

9    could go to slide 15, please.

10          What this claim is really talking about is the

11   exchange of the unique identifiers for the process of

12   on-boarding and a device be it a dumb remote control, a

13   simple switch or a smartphone that meets each of these

14   elements as set forth in the claim would be sufficient to

15   infringe.  Based on the broad language of the specification,

16   the language of the claim itself, the inventor's statement

17   that only the claim should define the scope of the invention

18   and the specific focused arguments made in prosecution,

19   there's no basis to limit control device to preclude a

20   smartphone.

21          THE COURT:  All right.

22          MR. FRANKEL:  That's all I have unless you have

23   further questions, Your Honor.

24          THE COURT:  Not at this time.  I will hear from

25   Comcast.  Thank you.

1          MS. SOOTER:  Thank you, Your Honor.  This is

2     Mindy Sooter from Comcast.

3          THE COURT:  Ms. Sooter, could you turn your

4     volume up just slightly?  You are not coming across quite as

5     clearly as the other attorneys so far.  Is there a way you

6     can adjust your volume, make it a little louder?

7          MS. SOOTER:  Yes, Your Honor.  Is this better?

8          THE COURT:  Much better.  Thank you.

9          MS. SOOTER:  Thank you, Your Honor.  If we could

10    go to slide 42, please.

11          Your Honor, as Mr. Frankel mentioned, this

12    disputed term is found in the '964 patent, which we call the

13    enrollment patent, because it relates to the on-boarding of

14    electronic devices into an automated home system.  And this

15    patent, Your Honor, was filed in 2012, and one thing that's

16    important and notable about this patent is that it took over

17    five years to issue, so the Patent Office and the inventor

18    prosecuted this patent for a very long time, and during

19    that prosecution, this patent application underwent four

20    Patent Office rejections, six patent owner responses, five

21    sets of claim amendments, and five Examiner interviews.  In

22    other words, there's a very long and involved prosecution

23    history associated with this patent and there's a simple

24    reason for that.  The prior art was already very crowded by

25    the time this patent application was filed in 2012.  And,

1    Your Honor, during this very voluminous prosecution history,

2    the patent owner made express statements about the scope of

3    the claims.  And with our proposed construction for control

4    device, we simply ask Your Honor to hold the applicant to

5    the statements that they made to the public and to the

6    Patent Office about the scope of these claims.

7              If we could go to slide 44, please.

8              Now, there are many examples in the patent about

9    what the term means and what the patent is about and this is

10   one of those examples and it's consistent with the rest of

11   the patent.

12             The patent here says that there is a following

13   example of on-boarding a lamp to a home network and using

14   the concierge device to control the lamp, and the concierge

15   device is shown as a smartphone in the upper right

16   highlighted in green, and this is Figure 7, which is also on

17   the cover of the patent.  And then going down to where the

18   highlighting resumes about four lines from the bottom, this

19   example explains that a user can onboard a switch, which is

20   highlighted in red in the figure, in a circle and noted SW,

21   and can dedicate that switch to controlling the lamp.  And

22   then the user can use either the switch or the concierge

23   device to control the lamp, and the lamp is highlighted in

24   blue in the figure, and that's sort of the gist of the

25   technology that is described.

1          But if we could go to slide 45, you will see

2     that the claims are very long and there are very many

3     requirements that the patent applicant included in order to

4     get this patent.  One of those does have to do with

5     configuring the handheld concierge device to replicate

6     controls provided by this control device and to send the

7     command strings to the first controllable device, and,

8     again, the concierge device, one of the examples in the

9     patent is a smartphone, but there are many embodiments of

10    concierge devices that are disclosed.  One example that is

11    used frequently throughout the patent for the control device

12    is a switch and an example of a controllable device is a

13    lamp.

14          And so if we could skip to slide 47, please.

15          We sought to construe control device and to hold

16    the patent applicant with the statement that the applicant

17    made to the public about what a control device is, and as

18    Mr. Frankel did acknowledge, the parties have agreed to the

19    definition of a different term, controlled device, because

20    the control device was not in dispute, and we both applied

21    the plain and ordinary meaning.  Control device in contrast

22    does not give the plain and ordinary meaning that the

23    plaintiff seeks to ascribe to it because during prosecution

24    they gave it a very express scope, and that express scope is

25    Comcast's proposed construction.  That proffered definition

1    is a simple apparatus, not a universal remote control or

2    smartphone capable of acting as a universal remote control

3    for controlling a device.

4            And to be clear, Your Honor, in our

5    construction, the dispute -- let's go to the next slide,

6    please.  The dispute boils down to one thing:  Did NexStep

7    tell the Patent Office and the public that its control

8    device is a simple device and is not a universal remote

9    control or a smartphone capable of acting as universal

10   remote control?  And we submit that the answer to that is

11   yes, and I hope that I will be able to illustrate that to

12   you in the next slide.

13           And I just want to pause on one thing, Your

14   Honor, that Mr. Frankel mentioned.  He mentioned that we

15   were giving the same interpretation to this term as we did

16   the prior two terms that Mr. Lee argued and that is not

17   correct.  The interpretation, the proper construction of

18   these two sets of terms is different and they are both based

19   on the express language that the patent applicant made

20   during the prosecution of the relevant patent, and so this

21   patent, we rely on the history of its patent application,

22   which is related, of course, to the '964 patent.

23           So let's go to slide 51, please.

24           And as Mr. Lee did, I would like to step through

25   a few of the events that occurred during the lengthy

1   prosecution of this patent, and we're going to jump in about

2   two-and-a-half years into the prosecution where the Patent

3   Office issued a final rejection.  The claims had been

4   pending for awhile.  There had been some back and forth.

5   And as you can see here, the Patent Office rejected the

6   claims based on the Maymudes reference that Mr. Frankel also

7   mentioned.  And here the Patent Office explained why it was

8   rejecting the claims and where it found the claimed control

9   device and the Maymudes reference.  Specifically, the Patent

10  Office said that the remote controller of the Maymudes

11  reference is interpreted as the first home control device of

12  the pending claims.  So let's go to the next slide and take

13  a look at the Maymudes reference.

14          As you can see, Maymudes does depict a remote

15  controller and it explains that a remote controller may be a

16  cellphone.  In other words, the Patent Office equated the

17  claimed control device to a cellphone.

18          Let's go to the next slide.

19          We're on slide 53, and here you can see where

20  NexStep responded to the Patent Office equating the control

21  device to a smartphone, a cellphone Maymudes.  And this is

22  what NexStep said in response.  They took issue with the

23  Patent Office equating the control device to a cellphone.

24  Specifically, NexStep said that there is a distinction

25  between a simple home control device and a universal remote

1    control in these claims, and the Patent Office hadn't given

2    that distinction adequate consideration or patent full

3    weight.

4         So a couple things are important here.  First,

5    the patent applicant, NexStep, is calling the control device

6    simple.  It's saying that its control device is a simple

7    device.

8         Second, NexStep is distinguishing this simple

9    home control device from a universal remote control.

10        Now, NexStep step goes on to say that their

11   Figure 7, and that's what's showing over on the right, it's

12   the same figure that's on the front of the patent, and this

13   is NexStep including the figure in its office action

14   response.  NexStep says, our Figure 7, which we went over

15   during our interview, illustrates a simple switch in

16   contrast to a smartphone capable of acting as a universal

17   remote control.  The switch is a circle labeled simply SW.

18        And if you can see faintly, NexStep actually

19   included a little arrow where they drew, they sort of called

20   out the SW in the little circle over on the right-hand side.

21   So NexStep is going even further here and using the term

22   simple switch interchangeably with a term simple home

23   control device and the claimed term control device and they

24   are going further in distinguishing that control device, the

25   simple switch in their words, with a smartphone capable of

1    acting as the universal remote control.

2            Let's go to slide 54.

3            Here you can see some additional arguments that

4    NexStep made in the exact same office action response where

5    they are distinguishing claim 2, which requires a control

6    device and a concierge device from the same Maymudes

7    reference.  They say, in claim 2, a simple home control

8    device is distinguished from a concierge device on which

9    control capabilities can be replicated.  Again, they are

10    calling the control device simple.  They added that word.

11    It's not present in the claims.

12            NexStep goes on to say, when Maymudes' cellphone

13    is equated to the concierge device.  As the Patent Office

14    says, there is nothing left to equate to a simple switch,

15    once again using the term simple switch interchangeably with

16    control device.

17            Let's go to the next slide.

18            Your Honor, there are many examples of NexStep

19    equating the term control device to a simple switch, and

20    here are just two more of them in Exhibits B-35 and B-34,

21    where they simply use the term simple, SW, interchangeably

22    with the term control device.  To be clear, the claims

23    require a control device.  It's their language equating the

24    simple switch to that control device.

25            Let's go to slide 56.  And here you can see that

1    the Patent Office did not agree, and it once again rejected

2    the claims, this time over three references -- Wenham, Hayes

3    and Maymudes.

4            In response, NexStep did not change its argument

5    one single bit.  Instead it repeated verbatim the same

6    distinction that it had made between the "simple home

7    control device and a universal remote," and it also

8    reiterated its distinction between the home control device

9    and a smartphone capable of acting as a universal control

10   and, once again, it highlighted that this control device was

11   just a simple switch.

12           Next slide, please.

13           Now, in response, the Patent Office did not

14   agree and issued a final rejection.

15           Next slide, 59.

16           And NexStep canceled all of the pending claims

17   and decided to start fresh with new claims, but as you can

18   see in the middle, in the receiving second enrollment

19   signal and then registering the second control device, these

20   claims still require a control device.

21           So slide 60, please.

22           So NexStep had once again to convince the Patent

23   Office that the elements in the new claims were not found in

24   those three prior art references, Wenham, Hayes and Maymudes

25   the Patent Office had previously relied on in a rejection.

1    And so what NexStep did was it created a chart to illustrate

2    to the Patent Office where the elements in the claims were

3    or were not found in the prior art references.

4              And here you can see, they point first to the

5    element control device.  They say that there were control

6    devices in the Wenham reference because Wenham disclosed

7    light switches, but in contrast there were no control

8    devices in Hayes because Hayes only described universal

9    remote controls.

10             Let's take a look at the next slide, 61.  This

11   is Hayes.  And you can see that Hayes quite clearly

12   described a universal remote control.  And I will just also

13   reference paragraph 6, which is not shown here, but it

14   actually says that there could be one or more remote control

15   and so there could be multiple -- excuse me, multiple

16   universal remote control devices disclosed by the Hayes

17   reference.

18             So in slide 62, you can see the plaintiff and

19   NexStep, the patent applicant's response and explanation of

20   its chart, and it explicitly says here that Hayes includes

21   only a universal remote control, not a control device at

22   all.  And on slide 63 you can see that the Patent Office

23   finally, after that explanation and the new claim, issued

24   the claim.

25             Now, if you look at slide 64, and in the

1   material, Exhibit C-9, you can see that Comcast's expert,

2   Dr. Villasenor, carefully analyzed the prosecution history,

3   and he agrees that a person of ordinary skill in the art

4   would have understood that the patent applicant had

5   expressly explained, and, in fact, disavowed any claim scope

6   that would encompass a universal remote control or a

7   smartphone acting as a universal remote control.

8           And in the next slide, 65, you can see the full

9   section of the plaintiff's expert's opinion about the

10  meaning of control device.  He spends less than one page

11  analyzing the meaning of control device and never mentioned

12  the prosecution history once, not a single time.  So we

13  would submit that the only expert declaration here, Your

14  Honor, supports Comcast's definition.  Of course, there's no

15  need to look to the extrinsic evidence here, but if you do,

16  there's only one place to look.

17          Now, if we could please go to slide 69, Your

18  Honor, we can see that the patent itself is consistent with

19  the statement that NexStep made during the prosecution.

20  Over and over and over again, the example of the control

21  device that is used in the figures is the same red circle

22  with the SW indicating the switch and over and over the

23  plaintiff's reference that the concierge device and the

24  switch are two different things.  And on the next slide you

25  can see over and over and over again in the text that the

1   plaintiffs equate the control device to a simple switch.

2              So going to the next slide, 71, we would submit,

3   Your Honor, that our, Comcast's proposed construction is a

4   correct construction here, and you can see that it maps

5   exactly the express language that the plaintiff used to

6   persuade the Patent Office and to explain to the public what

7   these claims mean and specifically, what control device

8   means, and based on the public notice function of Section

9   112, we ask that the plaintiff be held to that construction.

10             Now, we do provide some response to the

11  plaintiff's arguments.  The plaintiffs made three arguments

12  to try to avoid its own prior statements and I'm going to go

13  through them quickly in the interests of time.

14             Your Honor, on slide 72 we can see NexStep's

15  first attempt to avoid its own prior statements, and they

16  argued that the specification specifically defines a control

17  device as a concierge device.

18             Now, I was a little bit confused by

19  Mr. Frankel's slides because he said when he was talking a

20  moment ago that Comcast equated a control device and a

21  concierge device.  But, Your Honor, that's exactly

22  backwards.  It's NexStep that was seeking to argue "that the

23  patent specifically defined control device as a concierge

24  device."  That's what they said in their brief and that's

25  not the case.

1            The patent is very clear that these are two

2  different things and so is the prosecution history, and

3  we've included those quotes here, but the quotes that they

4  rely on don't define the control device.  They simply define

5  the concierge device.

6            Let's move on to slide 76.

7            In fact, it was the patent owner itself that

8  said during prosecution that in response to a Patent Office

9  rejection, that there was a major problem with the Patent

10 Offices, analysis, and that was that Harris has an

11 electronic system and that cannot be both a control device

12 and the concierge device.  So we would submit that it's

13 actually NexStep that's trying to conflate the control

14 device and the concierge device and they can't be equated.

15            Let's go to slide 77.

16            I want to pause for a moment because

17 Mr. Frankel's argument was very focused on other statements

18 that NexStep made to the Patent Office, but those other

19 additional statements include other additional arguments

20 that NexStep tried to make to the Patent Office in order to

21 get its claims and to distinguish its claims.  But, Your

22 Honor, the law is very clear that regardless of the number

23 of arguments that NexStep made and what the Patent Office

24 actually relied on, NexStep must be held to its statements

25 made during prosecution about the scope of the claims and

1    the claim terms.  And the Federal Circuit has said that in

2    the Microsoft case.  In other words, a patentee's statements

3    made during prosecution, whether relied on by the Examiner

4    or not, are relevant to claim interpretation, and that's

5    regardless of the number of arguments they made.  The fact

6    of the matter is they did expressly explain the scope of

7    control device.  They did expressly tell the public what a

8    control device was and wasn't importantly and that it wasn't

9    a smartphone, and the public is now entitled to rely on

10   that.

11             And, finally, Your Honor, if we go to slide 78,

12   NexStep itself argues that there are different roles to the

13   concierge device and control device, that they don't depend

14   on one being a smartphone and the other not being a

15   smartphone, but, Your Honor, regardless of whether that

16   would have been true, NexStep's own explicit statements to

17   the Patent Office disavow any scope of the term control

18   device that would encompass a universal remote control or a

19   smartphone capable of acting as a universal remote control.

20   This is not something that Comcast has injected, this is

21   something that the Patent Office argued.

22             And if we go to slide 80.

23             Your Honor, the public has a right to rely on

24   what NexStep said during prosecution, and the public can

25   specifically rely on the inventor's statements made to

1    distinguish the prior art and to explain what this claim

2    scope is.

3              And going to slide 81, the proper construction

4    here is what NexStep told the Patent Office that a control

5    device is a simple apparatus, not a universal remote control

6    or a smartphone capable of acting as a universal remote

7    control for controlling a device.

8              Thank you, Your Honor.  That's all I have.

9              THE COURT:  All right.  A couple of questions.

10   First, you started to fade out a little a little bit with

11   your microphone.  Yes.  Better.  Thank you.

12             I understand your arguments and the lengthy file

13   history for this particular patent, but I'd like you to

14   address a couple of things.

15             When I asked Mr. Frankel where in the patent

16   specification is the control device characterized as a

17   smartphone, universal remote, et cetera, he brought up

18   plaintiff's slide 16, which he then went on to indicate had

19   descriptive, quote unquote, "robust features that you could

20   have in a smartphone."

21             How do you reconcile that with your arguments?

22   And then also my second part of my question that I'd like

23   you to address is the plaintiffs brought up claim 21 and

24   said, and I'm paraphrasing, that it's the exchange of unique

25   identifiers that the claims are all about in this patent,

     1    and I have not heard you mention unique identifiers.  So can

     2    you address both of those points, please?

     3              MS. SOOTER:  Yes, Your Honor.  So, first of all,

     4    regarding Mr. Frankel's slide 16, he does point to several

     5    quotes within the '964 patent, and they do discuss a home

     6    control device.  But that was written and provided, of

     7    course, during the patent, when the patent application was

     8    filed in 2012, and two-and-a-half years later, when they

     9    could not get their -- when they could not get their patent

    10    through the Patent Office, then the plaintiff, NexStep, had

    11    to actually distinguish its control device from the prior

    12    art, and at that point they told the public and the Patent

    13    Office that the control device was the simple switch.  It

    14    started calling it a simple switch.

    15              Now, first of all, and perhaps what we could do

    16    is actually go to our slide 71.

    17              Two-and-a-half years into the prosecution --

    18    well, let me start here.  The patent actually does discuss

    19    over and over again that a control device is a switch, and

    20    you can see that here in Figure 7 where it's labeled SW as

    21    the example.

    22              Now, the plaintiff could have distinguished the

    23    claims without even trying to make this argument, but they

    24    did not.  They distinguished the claims from the Maymudes

    25    reference and other references by arguing that the control

1    device was, A, simple, and, B, a simple switch as their

2    example and that it was not a smartphone.

3              So regardless of the embodiments in the patents

4    that have some of the features that Mr. Frankel pointed to,

5    such as the video phone, the fact of the matter is that

6    two-and-a-half years after the patent was filed, the patent

7    applicant chose to argue that the control device was simple,

8    a simple switch, in fact, that was not a smartphone or a

9    universal remote control.  And so the Patent Office, the

10   plaintiff expressly told the public that's what the control

11   device was.

12             Now, I will say that even if there is a screen

13   on a control device, it doesn't mean that it's a smartphone,

14   and not a single one of these quotes or anywhere else in the

15   patent says that the control device can be a smartphone or a

16   universal remote control.  So I would submit that at best,

17   these quotes from the patent are ambiguous.

18             Second, Your Honor, in response to the question

19   about claim 21, what Mr. Frankel was doing was arguing that

20   there were other distinctions in addition to this

21   distinction about what a home control device was, and it

22   doesn't really matter if the patent applicant made

23   additional arguments to the Patent Office.  The fact remains

24   that the patent applicant did make this argument to the

25   Patent Office and did ascribe a specific meaning to the home

1     control device, and the public is entitled to rely on the

2     inventor's description of what the claims mean.

3              The Federal Circuit case law, including the very

4     recent Personalized Media versus Apple case said that a

5     patent owner's description of what the claims mean should be

6     given weight and should be taken into account when defining

7     the claim.  And claim 21, I will point out, doesn't actually

8     have the language that Mr., that Mr. Frankel is relying on

9     regarding the unique identifier, at least in the '964

10    patent.

11             But I would be happy to answer any further

12    questions that Your Honor has.

13             THE COURT:  All right.  Not at this time.  Thank

14    you.

15             Mr. Frankel, respond.

16             MR. FRANKEL:  Yes, Your Honor.  In claim 1, the

17    term device identifier, there was no disclaimer broadly for

18    all of the claims that would limit the control device to a

19    switch.

20             And, Mr. Thomas, if you could pull up B-34 at

21    page 12.  This is the discussion that Comcast is pointing to

22    about the switch.  If you could zoom in on the second half

23    of the page, please.

24             So it says here, new claim strongly

25    differentiates between our simple switch and Maymudes'

1    improved universal remote control.

2              And now, so let's take a look at claims 30 and

3    33.  If you could go to page 7 and if you could zoom in on

4    30 to 33.

5              So here, the home control device, this is a

6    dependent claim.  It's limited to a switch and it doesn't

7    have a display capable of presenting a graphic user

8    interface.  If we look at 31 and 32, they all have these

9    additional limitations added to the control device as a

10   switch and limited in functionality.

11             So those arguments were made to distinguish

12   certain claims over the prior art, that those dependent

13   claims narrow home control device, and what that really

14   shows is on the claim differentiation, that the home control

15   device should not be limited to a simple switch consistent

16   with the broad disclosure in the specification.

17             If we could turn to B-39 at page 16, please.

18             So here we're now fast-forwarding a couple of

19   years and all of the claims have been rejected and there are

20   some new claims that show the second half.

21             A bunch of the claim elements are bold italics,

22   underlined.  There's a super emphasis being put hereby the

23   applicant.

24             If we could go to the next page, please.  And if

25   you can zoom in on the top half.  And keep going down.

1    Well, okay.

2              So here we have some further claim elements and

3    they are all relating to this device identifier and getting

4    the command controls, going to the database, using the

5    identifier to look up the control device and control device.

6              And if you could show the next paragraph,

7    please.

8              So here, what is distinguishing here the Wenham,

9    Hayes and Maymudes combination is the bold phased

10   limitations, which are about the use of these command

11   strings and identifiers.  That is what is not found in the

12   prior art.  You can read the entire file history backwards

13   and forwards to the end of time.  There's no statement where

14   the inventor says the control device has to be a simple

15   switch.  Yes, there are some claims that narrow it in that

16   way, but what is generally used to overcome is the

17   particular claim elements relating to the command string.

18             And can you pull up Comcast slide 61, please,

19   and if you could show that figure in the center.

20             Just to be clear, the argument that there's no

21   control device, the argument that the inventor is making

22   here is that, yes, there's a smartphone, and that would

23   correspond to the concierge device.  There would be nothing

24   else left that would correspond to the control device.

25             So that is the argument being made, that you

1    need to have two separate devices.  There has to be a

2    concierge device, at least one concierge device and at least

3    one control device.  It can't be the same device that's

4    satisfying both roles.  So that's the argument that Comcast

5    is pointing to when they say that there would be no control

6    device, is just saying that the smartphone is being mapped

7    onto the concierge device and there's nothing else left that

8    could possibly be mapped to the control device.  It's not

9    saying that the control device could not be a smartphone.

10                I will leave it with that unless there are

11   further --

12                THE COURT:  A follow-on to that, just address --

13   I thought one of the arguments made by defendant in the

14   briefing was that the language in the specification on that

15   issue relied upon by the plaintiff to define control device

16   only mentioned concierge.

17                MR. FRANKEL:  Well, Your Honor, we're relying on

18   the specification, everything that I showed on slide 16.

19                Mr. Thomas, if you could pull that up.

20                Each of these quotes is specifically limited to

21   the control device.  So even granting Comcast that one

22   paragraph was limited to the concierge device is ample

23   support here that the control device would have robust

24   functionality, and certainly, there's nothing in the

25   specification, nothing in the express limitation in the

1    claims and nothing in the arguments that distinguish the

2    prior art that would preclude the control device from being

3    a smartphone.

4              THE COURT:  All right, then.  Anything further,

5    Ms. Sooter?

6              MS. SOOTER:  Just three very brief points, Your

7    Honor.

8              First of all, there are no dependent claims in

9    the '964 patent, but add the requirement that the control

10   device be a switch.

11             Second of all, in the Hayes reference at docket

12   83-1, page 31, if you look, you will be able to see

13   paragraph 6, and paragraph 6 specifically says that in the

14   Hayes reference, one or more remote control devices are

15   disclosed.  So the argument that when the one remote control

16   device is used up, there's nothing left to be a switch in

17   the Hayes reference is simply incorrect.

18             And, third, Your Honor, regardless of what the

19   embodiments say in the patent, the patent owner here is a

20   patent applicant who employed the inventor, made a conscious

21   choice to limit the meaning of control device during

22   prosecution in order to get these claims to a simple device,

23   not including universal remote control or a smartphone

24   capable of acting as the universal remote control.

25             Thank you, Your Honor.

```
 1              THE COURT:  All right.  Thank you, counsel.
 2   This seems an appropriate time to take a break.  Why don't
 3   we return about 12:45 and resume the claim construction
 4   hearing.  Thank you.
 5              (Short recess taken.)
 6                   -  -  -
 7              (Proceedings resumed after the short recess.)
 8              THE COURT:  I will let counsel know I've
 9   rejoined.  We will give a few more minutes for others to
10   join their video and audio again.
11              All right, counsel.  Are we still waiting on
12   a few others or are we ready to proceed with concierge
13   device?
14              MR. FRANKEL:  We're ready to proceed on our end
15   if you are, Your Honor.
16              THE COURT:  Okay.
17              MS. SOOTER:  Yes, Your Honor.
18              THE COURT:  All right.  Very well.  I'm ready to
19   go forward.  I will leave my audio on as long as I'm not
20   having transmission and bandwidth difficulties again and
21   then I will shut it off if I am.  So I'm ready to hear about
22   concierge device.
23              MR. FRANKEL:  Can we start at slide 20, please.
24              So, Your Honor, the parties agree that concierge
25   device is a coined term.  NexStep's position is that its
```

1    attributes are described in the individual claims, which are

2    varied.  Comcast would, and the real dispute here is that

3    Comcast would read in limitations across all of the claims

4    that every concierge device has to have a microphone, a

5    speaker, a function button or input sensor, memory and the

6    wireless transceiver.

7              If we could have the next slide, please.

8              Here is one claim, claim 1 from the '009 patent,

9    which talks about the concierge device without specifying

10   the particular input/output components, but there are other

11   claims that do specify which components it would have.

12             Next slide, please.

13             Here in the specification, this is in addition

14   to the broad statement that I read before that the

15   specification provides examples, but they are not intended

16   to limit the scope of the invention.  It's only the claims

17   themselves that do.  There are actually 22 different

18   varieties of concierge devices that are discussed as

19   examples in the specification.

20             In the second paragraph, there's a statement

21   that the concierge device can include a microphone and a

22   speaker as the input and the output.  That's permissive,

23   open-ended language.  It doesn't say that it must include a

24   microphone and a speaker.  This example, which is

25   characterized as a simple device, it could be programmed by

1      using voice interaction or it could be programmed using a

2      PC, so the idea would be that you could, in a concierge

3      device that does not have a microphone or speaker, you might

4      plug it into the PC and you could use that to configure its

5      features.

6              Then there's an alternative device that is

7      described.  Instead of using the microphone and the speaker,

8      the input and output is a keyboard and a device display, so

9      that would be more like a Blackberry.  So you could use the

10     monitor on the concierge device and the keyboard to program

11     it and set its configuration.

12             Now, the next paragraph is the one that Comcast

13     seized upon for its proposed construction.  It says that the

14     simplest concierge device lacks a display or only has a

15     basic monochrome display and it need only have a microphone

16     speaker and some buttons.  Now, that's not saying that every

17     concierge device needs to have a microphone or a speaker.

18     It's saying that in a very simple version, the input and

19     output would be done with just the microphone and a speaker.

20     You would talk to it and give it voice commands.  But that

21     doesn't negate the other embodiments described, for example,

22     where the input and output is done with a keyboard and the

23     display, or by connecting it to a PC.

24             If we could have the next slide, please.

25             Here in contrast to the broad claim that I've

1      put up before, these are different claims that specify

2      different input/output options.  You see claim 24 says that

3      the dedication command is received by a microphone.  And

4      then in 25, we see that the dedication command is provided

5      using a screen touch on the display.

6                    So, and finally, we have that statement that the

7      preferred embodiments are only for purposes of illustration

8      and not to limit the claim scope.

9                    So there's no basis to limit each and every

10     claim referencing the concierge device as specifically

11     having input and output options that Comcast seeks based on

12     the broad language and the fact that specific input and

13     output devices are recited in dependent claims.

14                   Unless Your Honor has questions, I'm happy to

15     keep this argument short.  Oh, Your Honor, I'm sorry.  I

16     believe your audio is on mute.

17                   THE COURT:  I was just about to un-mute.  I said

18     that, no, I think you answered -- my questions really were

19     framed around that language in the specification that you

20     pointed out referencing the simplest concierge device with

21     those five features, and I think you've addressed that, so I

22     will hear from Comcast on this.

23                   MS. SOOTER:  Thank you, Your Honor.  Mindy

24     Sooter again for Comcast.

25                   Let's go to slide 83, please.

1          The concierge device applied to the '009 and

2     '697 patents as well as the '964 patents that we just talked

3     about, in fact, this is a term that's not even mentioned in

4     any of the tether patents that Mr. Lee discussed earlier.

5          And if you go to slide 84, the patent starts off

6     by saying, we disclose a concierge device that can be

7     configured to register, control and support a consumer

8     device, and that's in column 2.  It is also in the abstract.

9          And let's go ahead and turn to page 86.

10         As Mr. Frankel just mentioned, there's no

11    dispute that this is a coined term, which simply means that

12    the inventor made it up.  It has no plain and ordinary

13    meaning in the art in both sides' proposed constructions,

14    but NexStep's construction simply construes concierge device

15    to be a device including functionality for the remote

16    control of another device.

17         We would submit, Your Honor, that that is not

18    helpful and it's not accurate as to the way the inventor

19    described this device in the patent itself whereas Comcast's

20    proposed construction is consistent and it actually reflects

21    the actual word that the inventor used in the patent, and

22    that's the device with at least a microphone speaker, a

23    function button or input sensor, a memory and a wireless

24    transceiver.  And as Your Honor just noted, that is actually

25    in the claim, the patent specification itself.

1          So slide 87 reflects the dispute between the

2    parties, and that's simple.  Did the patent state that the

3    following minimum requirements for the claimed concierge

4    device are required?  A microphone, a speaker, a function

5    button or input sensor, a memory, and a wireless

6    transceiver?  And we would submit that the answer to that is

7    yes.

8          And if you look at slide 88, the patent

9    specification and what the inventor said about the concierge

10   device in the specification is critical in this case because

11   the parties agree it is a coined term, so as Your Honor

12   knows, that term is best understood by what the inventor

13   said in the specification itself.

14         Let's go ahead and skip to slide 91.

15         Now, there's no dispute between the parties that

16   the patents do disclose a number of embodiments for a

17   concierge device.  In fact, the patents say that it can come

18   in a variety of form factors.

19         And if you look at slide 92, there's also no

20   dispute that the patent discloses optional features, such as

21   a display.

22         If you look at 93, the question though is if

23   that's the case, that there are many embodiments and there

24   are many different variations, what is a concierge device?

25   Something that doesn't have a plain and ordinary meaning.

1    How would a juror, for example, understand what this is?  In

2    other words, what are the minimum requirements?  And here

3    the inventor answered that question.  The inventor

4    explicitly said in the patent that the simplest concierge

5    device lacks a display or includes a minimal monochrome

6    display and it need only have a microphone, speaker, one to

7    a few function buttons or input sensors, a memory and at

8    least one wireless transceiver.

9            So regardless of what else the concierge device

10   may or may not be, it needs to have certain minimum

11   requirements, just like if you were looking at a dog, you

12   would expect a dog have certain fundamental characteristics

13   regardless of how many different breeds of dog or optional

14   types of features an animal might have, and that's the case

15   here, Your Honor, as well.

16           And because the patent specification is so

17   important to this made-up term, the inventor should be held

18   to clearer words.  And, in fact, if you look at slide 95,

19   Comcast's proposed construction doesn't contradict any of

20   the prosecution history or the patents or the claims.  The

21   patents -- the applicants made clear that the features of

22   the concierge device, such as linking wirelessly or

23   conducting audio interactions, those are all features that

24   are supported by these five minimum features that the patent

25   requires.  That's consistent throughout the prosecution

1     history, the patent itself, and the claims.

2               So let's flip to slide 99.  And I would like to

3     respond to some of the arguments that NexStep makes.

4               NexStep first argues that the specification is

5     not definitional, but again, Your Honor, I would just -- at

6     the risk of repeating myself, say that in this particular

7     case, the specification is important because of the nature

8     of this made-up term and also because the patent applicant,

9     the inventor himself, explicitly defines the requirement for

10    the very simplest, most basic concierge device.

11              And let's go to the next slide, please.

12              NexStep's second argument is claim

13    differentiation, but that argument suffers a fatal flaw, and

14    the flaw is that the claims it points to do not add the

15    features that Comcast proposes in its construction.

16    Instead, the claims are differentiated based on other claim

17    requirements that they add to the independent claims, and

18    that doesn't amount to claim differentiation, as the Federal

19    Circuit has found.

20              So let's take a look on the next slide, 101, at

21    a couple of examples.

22              So, for example, dependent claim 24 has the

23    requirement, wherein the dedication command is received from

24    the user via a microphone.  Well, that's not adding a

25    microphone.  That's defining how a dedication command is

1    received.   Likewise, claim 25 says there may be a different

2    way of receiving a dedication command.

3              So claim differentiation is not a viable

4    argument here for NexStep.  The same is true on slide 102.

5    Again, this dependent claim 18 in the '009 patent doesn't

6    add one of the five pieces of hardware that Comcast proposes

7    in its construction and instead it defines where a menu is

8    an audio menu.

9              So let's go to slide 103, and NexStep's third

10   argument is that in the file history, it distinguished the

11   pending claims, but did not distinguish the claims based on

12   these five requirements, but we would submit that its actual

13   distinction here as highlighted in yellow does actually

14   distinguish these claims based on related features, namely,

15   that the concierge device can capture a user's voice.  Well,

16   that's directly related to the microphone, and that it

17   reproduce audio, and that's, of course, directly related to

18   a speaker.

19             So if we could finish up on slide 104, please.

20             Your Honor, NexStep's proposed construction we

21   would submit is not only incorrect, it's not a complete

22   representation of what the patent applicant, the inventor

23   here said his concierge device required.  Comcast's

24   construction, however, is faithful to the exact words of the

25   inventor.

1          And, Your Honor, before I conclude, I would

2     like to address the language in claim 21 that Mr. Frankel

3     raised -- sorry, column 21 of the '009 patent that

4     Mr. Frankel raised, and if we could put up NexStep lied 22,

5     I just wanted to point to one thing, Your Honor.

6          Looking at NexStep slide 22, they highlight some

7     language from column 21 of the '009 patent at line 5 and 6,

8     and that's right here starting with the words a simple

9     concierge device.

10         I would just note, Your Honor, that I believe

11    that the emphasis here is on the wrong part of the sentence.

12    Mr. Frankel emphasized the simple concierge device can

13    include a microphone and speaker but not the entire

14    sentence, and the full sentence actually says, a simple

15    concierge device can include a microphone and speaker

16    without a display.  And as we've already mentioned, there

17    are other places in the patent that describe that a display

18    is optional, and that's really all that this sentence is

19    saying.  It's in no way inconsistent with Comcast's proposed

20    construction.  And so returning to Comcast slide 104,

21    please, I would just ask Your Honor to hold the inventor to

22    the minimum requirements that he defined for this made-up

23    term and to provide some meaning to this otherwise undefined

24    device and define it as a device with at least the

25    microphone, a speaker, a function button or input sensor, a

1    memory and a wireless transceiver.

2              Thank you.

3              THE COURT:  As I understand it, Comcast's

4    arguments are largely focused around the specification

5    language that references the simplest concierge device as

6    meeting only half of the five features included in the

7    proposed construction.

8              So I take it you would disagree with plaintiff's

9    argument that even though there are more than 20 different

10   embodiments and 21 claims reciting concierge device over

11   these three patents, that the defendant's proposed

12   construction does not add limitations into the claims from

13   exemplary, non-limiting embodiments?

14             MS. SOOTER:  Yes, Your Honor.  Essentially, what

15   we were looking for and trying to provide some meaning to

16   this term, concierge device, is the lowest common

17   denominator.

18             Based on all of the embodiments that are in

19   the patent, what is the essence, what is required by this

20   device as the inventor himself told us?  And the only real

21   clue we have as to that common denominator is that it

22   requires at least these five pieces of hardware.  It also

23   says in the abstract there are some functions that it does,

24   but the most important thing is, how do you identify it,

25   what does it have to have, and for that we look to the

1    inventor's word.

2              THE COURT:  All right.  Anything further on

3    behalf of NexStep, Mr. Frankel?

4              MR. FRANKEL:  Yes.  Just one point, Your Honor.

5    If we could have Comcast slide 103, please.

6              So this is the portion of the file history where

7    Comcast contends there was a broad disclaimer of concierge

8    device.  You know, just to be clear, this is -- there's

9    limitations that have been added to claim 28 specifically

10   saying that the concierge device can capture the user's

11   voice and reproduce audio for the user to hear.  And then

12   just looking at the portions that Comcast highlighted, the

13   argument that the inventor made was that the boldfaced

14   limitations are not found in the prior art reference.

15             So the inventor never said each and every

16   concierge device has to have a microphone and an audio

17   output.  To the contrary, this one particular claim was

18   further narrowed by adding this microphone and speaker

19   element, and then the argument distinction, the prior art

20   was limited precisely to those claim elements, not to a

21   redefinition of concierge device.

22             And as the specification makes clear, there's a

23   wide variety of concierge devices and the claims variously

24   describe the concierge device based on the functions that it

25   provides.

1          THE COURT:  All right.  Ms. Sooter, anything

2     further, or shall we move to voiceover IP?

3          MS. SOOTER:  Nothing further on this term, Your

4     Honor.

5          THE COURT:  All right.  Let's move along then to

6     the next one, voiceover IP.

7          MR. FRANKEL:  If we could have slide 24, please.

8     Thank you.

9          So, Your Honor, there are really two disputes

10    here, although one aspect, it's not even clear if Comcast is

11    disputing.  VoIP originated with voiceover IP.  It was an

12    Internet-based way of replacing telephone networks, but it

13    has come to have a much broader meaning.

14         Just as when I try to explain to my kids about

15    dialing a telephone number, we still use that term today,

16    but it doesn't, in no way refers to, you know, turning a

17    spinning device that makes magnetic signals.  They look at

18    me like I'm crazy when I talk about that.

19         So here Comcast agrees that the term voice is

20    not limited to the original voiceover IP protocol, which has

21    been around for a long time, and that it has become

22    genericized and refers to a much broader class of

23    communications protocols.

24         One aspect is that NexStep seeks a construction

25    that voice refers to audio data and Comcast would limit it

1    to voice conversation data.  I'm not really sure what that

2    means.  There's no distinction between audio and voice

3    conversations.  These protocols that are used to capture and

4    transfer audio data don't know if it's a dog barking or a

5    person talking, and that is not -- as we'll discuss, the

6    specification doesn't limit voice conversations or

7    conversations replacing a telephone call.

8              The second area of disagreement is that Comcast

9    has said that in their proposed construction, they said that

10   it should be limited to Internet protocol in particular

11   whereas Dr. Selker, our expert, pointed out that today voice

12   refers to packet switched networks generally, which

13   includes, but is not limited to, the Internet.

14             Some of the most famous and well-known examples

15   of voice today, such as Skype, or even Zoom that we're

16   using, use, you know, the data can be carried over the

17   Internet, but it can extend beyond the Internet domain.

18             In the briefing and in the expert declaration, I

19   don't believe that Comcast seriously disputes the second

20   point, that it's not limited to Internet Protocol, capital

21   I, capital P, but that any packet switch protocol would be

22   sufficient.  But I will focus, so with that, I will focus on

23   the audio data portion.

24             If you go to the next slide, please.

25             Here we have the -- you know, the term voice is

1    not particularly central to the claims.  What it's referring

2    to in this example from the '130 patent, claim 10, is that

3    there's a palm-held remote and there's a console component,

4    and the console component is decoding some of the audio

5    information that is then further processed by the palm-held

6    remote.

7                   If we could go to the next slide, please.

8                   Here we see that the remote that's receiving

9    this data can perform, it's a complete input/output platform

10   that you can hold in your hand.  It can be used for a wide

11   variety of applications.  It can be used as a microphone,

12   but it could be used for other purposes -- dictation,

13   note-taking, voice messaging, listening to music, watching

14   video.  So these are all things that the data that is being

15   passed along through the remote can include.

16                  And then we have a quote from Dr. Selker's

17   declaration, where he says that VoIP historically originated

18   from a replacement for the public switch telephone network,

19   but today the person of ordinary skill in the art would

20   understand that it's broadly referring to audio data that's

21   being sent over a packet switch network.

22                  That's all I have unless there are any

23   questions.

24                  THE COURT:  Where can you guide me in the

25   intrinsic evidence?  How do we get to the plaintiff's

1    construction where any audio data using any protocol and/or

2    format is considered VoIP?

3              MR. FRANKEL:  Well, we have to -- VoIP, unlike

4    some of the other terms we've discussed in particular,

5    concierge device, VoIP is not a coined term, and it is a

6    term that has a very specific but broad meaning to the

7    person of ordinary skill in the art.  There's nothing in the

8    intrinsic record that specifically narrows it, so then we

9    have to look at how the person of ordinary skill in the art

10   would understand the term.  The plain and ordinary meaning

11   of VoIP is packet switched audio data.

12             THE COURT:  And, again, what do you rely on for

13   that?

14             MR. FRANKEL:  That's the declaration of Dr.

15   Selker.

16             Now, he's not redefining, he's explaining what

17   the meaning of the word VoIP is as would be understood by

18   the person of ordinary skill in the art.

19             THE COURT:  All right, then.  I will hear from

20   Comcast on this.

21             MS. PETTY:  Thank you, Your Honor.  Sarah Petty

22   for Comcast.  Good afternoon.  Can you hear me okay?

23             THE COURT:  Good afternoon.  Yes.  It takes me a

24   while to get to my un-mute button, but, yes.

25             MS. PETTY:  Thank you, Your Honor.  If we could

1    start on slide 104, please.  My apologies.  Slide 106.

2            So, Your Honor, this term will take us back to

3    the tether patents that Mr. Lee discussed earlier today, and

4    I will endeavor not to repeat anything that he has already

5    informed the Court.

6            If we could go to slide 108, please.

7            So as Mr. Frankel indicated, Your Honor, the

8    parties agree that VoIP has an industry standard meeting,

9    but they have a fundamental dispute over the scope of this

10   term and what that industry standard meaning is.

11           And we would submit, Your Honor, that

12   notwithstanding the plain words comprising the acronym

13   itself, NexStep is seeking to readout VoIP entirely and to

14   broadly define VoIP as referring to any protocol used for

15   sending any audio data over any packet switch network.  And

16   we would submit that in contrast, Your Honor, Comcast

17   proposes the construction based on industry standard meaning

18   and intrinsic evidence.

19           So if we could go to slide 109, please.

20           Fundamentally, Your Honor, this dispute boils

21   down to whether voiceover IP requires protocol for

22   transmitting voice conversations specifically.

23           And if we could go to slide 110, please.

24           I will come back to these each in a bit more

25   detail, but we submit that the intrinsic evidence is

1    consistent with the industry meaning of this term and that

2    all of the intrinsic evidence, including claims of the

3    specification and the prosecution history emphasize

4    telephony specifically, and this is consistent with the

5    definition that Comcast's expert has submitted as well as

6    the industry papers and publications contemporaneous with

7    these patents confirm that the patents are using it in that

8    ordinary sense.

9              So if we could go to slide 110, please.

10             So the patents make clear, Your Honor, that VoIP

11   is Voice over Internet Protocol.  They spell it out here.

12   This is consistent with the claims.  We have here claim 7 of

13   the '802 patent, which likewise explicitly references voice.

14             Turning to the next slide, please.

15             Here is claim 10 of the '130 patent, and you

16   can see here the bottom quoted limitation refers to the

17   console component decoding voice to a remote control device

18   format.

19             Mr. Frankel said something in his presentation

20   that struck me at least if not consistent with Comcast's

21   understanding of these patents, which is that voice is not

22   an important concept in the patent, and we submit that that

23   is not correct and not consistent with the intrinsic

24   evidence, Your Honor.  Each of the independent claims

25   asserted in this case but for two expressly requires that

1    the console component or master device be -- from VoIP

2    specifically to a remote control device format on the other

3    hand.  This is language that was added in prosecution to

4    amend the claims, and so we would submit that this is an

5    important part of the invention, and that's consistent with

6    the specification.

7            So if we could go to slide 113, please.  And Mr.

8    Lee touched on this briefly.  The tether patents explain

9    that the real, you know, key of this invention is that this

10   remote control can be low cost and it can rely on the master

11   device and the console for a lot of its processing.  One of

12   the functionalities that it offers is this ability to

13   connect a user to a telephone network.

14           So if we could go to slide 114 please.

15           And this is consistent with the fact that a

16   number of the claims in this case expressly refer to

17   connecting a user to a telephone network.

18           If we could go to slide 115, please.

19           I'd also like to point the Court, Your Honor, to

20   claim 12 of the '710 patent, which is an independent claim.

21   And this is one of the two independent asserted claims in

22   this case that doesn't expressly require VoIP.  And so we

23   have here this limitation from an independent claim that

24   says that the remote control depends on the master device to

25   transpose audio and video from a streaming audio and video

1  format remote control device on the other hand, and this is

2  one of those claims that doesn't recite VoIP.

3          And if we turn then to dependent claim 413,

4  which depends from claim 12, that claim goes on to recite

5  that the remote control further depends on the master device

6  to transcode audio from VoIP to a remote control device

7  format.  So what the dependent -- so the independent claim

8  doesn't recite VoIP, this claim does.  The independent claim

9  recites streaming audio.  At the very least, this dependent

10  claim tells us that VoIP has to be something different from

11  just streaming audio.

12          So if we could go to slide 116, please, and this

13  is consistent with the repeated mentions in the

14  specification, Your Honor, of the purported invention's

15  ability to use voice technology, to use -- to connect users

16  to a telephone network.  We see here at column 20 of the

17  '130 patent, it expressly says voice, landline, cell, IP.

18  The specification spells out voiceover IP.

19          Go to slide 117, please.

20          And, again, the specification describes

21  telephony generally as an important aspect of the invention,

22  that these portions of the specification are recited in our

23  brief.

24          So unless the Court has specific questions about

25  these, I will leave these for the Court's consideration.

```
 1              THE COURT:  All right.  Just one, and I think
 2   this was referred to the briefing, slide 9.  So Comcast's or
 3   its expert disputes that in modern times, VoIP is applied
 4   for a wide range of packet switched networks.
 5              MS. PETTY:  Your Honor, I think the Internet
 6   Protocol portion of our definition came from the acronym
 7   itself.  I don't think we would dispute that a person of
 8   ordinary skill in the art might understand the IP portion of
 9   VoIP to occasionally refer to other packet switched
10   networks, but, again, the key aspect of Comcast's
11   construction, and I think Mr. Frankel alluded to the real
12   dispute between the parties is that the need for telephony
13   in the proposed construction and the need for two-way voice
14   communication, which is something present in Comcast's
15   proposed construction and not in NexStep's proposed
16   construction.
17              So if we could turn briefly --
18              THE COURT:  Mr. Frankel, anything further?
19              MS. PETTY:  Oh, Your Honor, if I may continue
20   just briefly, I have a bit more if the Court is willing to
21   entertain.
22              Okay.  So if we turn to slide --
23              THE COURT:  Yes.  Go ahead.  I'm sorry.  I
24   thought you were concluded.
25              MS. PETTY:  Oh, my apologies, Your Honor.  If we
```

1    could turn to slide 118.

2              We see that following up on what Mr. Lee said

3    with respect to the rejections in light of McQuaide, the

4    voiceover IP limitations were added during prosecution, so

5    during prosecution of the '130 patent, which is the earliest

6    filed of the asserted tether patents, NexStep's claims did

7    not originally recite voiceover IP, so the Examiner rejected

8    the claims in light of McQuaide.  And if we could go to the

9    next slide, please.

10             And in response to that rejection, NexStep added

11   the requirements that the claims include VoIP.

12   Specifically, included the requirement that the console

13   component decode voice to a remote control voice format and

14   decode digital content from the media card reader or hard

15   drive.  So we would submit, Your Honor, this limitation is

16   not sort of meaningless or irrelevant as it sounds like

17   NexStep has suggested.  This is something that was added

18   during prosecution to help overcome a rejection.

19             So in response to this rejection, NexStep

20   amended all of its independent claims to recite this VoIP

21   language and claim 19 as reflected on the screen is asserted

22   claim 10 of the '130 patent.

23             So if we go to slide 120, NexStep acknowledges

24   that it made the VoIP amendments in response to the

25   Examiner's comments about the art being based in its

1   telephony argument, and NexStep explained that it was making

2   these amendments to an invention, and one of the ways they

3   sought to do that was to add the limitation.

4           So if we could go to the next slide, which is

5   121, which is the Examiner's reasons for allowance.  And one

6   of the reasons the Examiner, in fact, allowed the asserted

7   claims was that the Examiner found that McQuaide didn't

8   disclose the resources of the console were adapted to decode

9   voice.  So, again, not only is this a limitation that was

10  added during prosecution, but this is part of the Examiner's

11  stated reasons for allowance.

12          So turning to slide 122, Comcast's expert,

13  Dr. Chatterjee, submitted a declaration.  That's of record.

14  Dr. Chatterjee has explained that a person of ordinary skill

15  would have known that voiceover IP refers to facilitating

16  voice conversations between two entities over a network

17  using the Internet Protocol.

18          If we could go to the next slide, please.

19          And attached to Dr. Chatterjee's declaration are

20  contemporaneous publications that confirm this

21  understanding, again referring to VoIP conversations over

22  the Internet Protocol.  This is on slide 123.

23          If we could go to slide 124, please.

24          So I would submit, Your Honor, that even the

25  publications attached to Dr. Selker's own declaration, and

1    Dr. Selker did not submit a declaration in response to Dr.

2    Chatterjee's, but in Dr. Selker's own declaration, his

3    exhibits expressly state that VoIP is a category of

4    technologies that route real-time VoIP conversations voice

5    conversations over the Internet.

6            So we would submit that voice conversations

7    should not be in dispute given one of ordinary skill in the

8    art here.  Turning to slide 123 and 124.

9            If we could pull up slide 127, please.

10           So, Your Honor, NexStep makes three arguments in

11   support of its proposed construction.  We would submit that

12   none of these suggest that the term should be construed

13   against its industry standard meaning and that's used in the

14   intrinsic evidence.

15           First they argue that the specification supports

16   that VoIP could be any kind of audio data.  Second, they

17   suggest that our construction would exclude audio included

18   with voice conversations, and third is the claim

19   differential argument, and none of those is submitted by the

20   record in this case.

21           So if we pull up slide 128, please.

22           This is the portion of the specification that

23   NexStep primarily relies on for its suggestion that VoIP can

24   include any kind of audio data, and, again, this is a

25   portion of the specification that they relied on other terms

1    as well.  What this just states, Your Honor, is that

2    features adaptable to VoIP, like a microphone, can also be

3    used for other purposes.  Nothing in here suggests that VoIP

4    should be construed to mean anything beyond its industry

5    standard meaning requiring VoIP conversations.

6                    Second, if we could go to slide '130, please.

7                    So NexStep has argued that our construction

8    would eliminate audio that's incidental to a voice

9    conversation.  This argument fails for two reasons, Your

10    Honor.

11                    First, it ignores that our construction is

12    directed to the protocols and formats that are required for

13    transmitting a voice conversation.  We certainly don't

14    intend to exclude a dog barking in the background of a

15    telephone call or anything like that and we don't think that

16    that criticism is sort of supported by the plain words of

17    our construction.

18                    And if we could go to slide 131, please.

19                    Again, this is consistent with Dr. Chatterjee's

20    declaration.  He has reviewed the portions of the

21    specification recited by NexStep and did not find that a

22    person of ordinary skill in the art would find they varied

23    the plain and ordinary meaning of this terms.

24                    So if we could go to the next slide, please.

25                    Finally, NexStep seems to make a claim

1   differentiation argument suggesting that the presence of

2   limitations that specifically reference telephone network

3   somehow mean that VoIP cannot be limited to voice

4   conversations.  We're not seeking to limit our construction,

5   Your Honor, to situations in which a VoIP call passes

6   through a traditional plain old telephone network.  The

7   references to the telephone network just confirmed that as

8   NexStep has so stated during prosecution, or as NexStep has

9   conceded during prosecution, that the art in question is

10  based in telephony and that the ability to connect, to have

11  a voice conversation using your remote control device and

12  your console is fundamental to this invention, supported

13  invention.

14          So if we could go to slide 133, please.

15          So unless the Court has further questions

16  about Comcast's construction, which I'm happy to answer,

17  we would respectfully request that the Court adopt

18  Comcast's construction of VoIP to mean protocols and data

19  formats for transmitting voice conversations over Internet

20  Protocol.

21          Thank you.

22          THE COURT:  Thank you.  I will hear anything

23  further from plaintiff.

24          MR. FRANKEL:  If we could go back to slide 26,

25  please.

1              THE COURT:  Mr. Frankel?

2              MR. FRANKEL:  Can you hear me, Your Honor?

3      Okay.  So Comcast put this top quote up.

4              THE COURT:  Yes.

5              MR. FRANKEL:  What's clear here is that the

6      functionality is not just limited to telephone call.  What

7      the claims talk about is that there's audio data that's

8      being in part encoded by a separate device from the remote

9      control device, and we're not trying to walk away from those

10     express claim limitations.  Here, there are functions such

11     as dictation, note-taking, voice messaging and specifically

12     listening to music or watching video.

13              The separate device still has to be doing the

14     decoding to help support the functions of the remote device,

15     but these are not limited to telephone call-type

16     applications.  Comcast pointed to some claims that do talk

17     about telephone applications, but that's not all of the

18     claims, some of the claims.  And the prior art that was

19     distinguished involved using the public switched telephone

20     network, we're not trying to recapture that scope here.

21     There's no suggestion that VoIP should be brought in to

22     cover old-fashioned telephone networks.  This is an entirely

23     separate issue, which is, is VoIP generally covering encoded

24     audio data or is it limited to, somehow limited to voice

25     conversations?  And as I said at the beginning of my

1    presentation, it's unclear what it even means to be limited

2    to voice conversations as opposed to audio data.

3              The protocols that are being used -- the point

4    about the barking dog is not that it's in the background or

5    the foreground.  It's that if I walked away and my dogs came

6    in and started barking, I appreciate the fact that they

7    haven't during this hearing, Zoom wouldn't know that it's

8    the dogs talking and not me.  It's just audio data coming

9    in.  It could be anything.  It could be Mozart or a person

10   talking or a dog barking.  It's just audio data that is

11   taking in, it's encoding, and then it's being sent to all

12   the people listening in.

13             So by limiting the claims to voice

14   conversations, it would only create confusion down the road

15   as to what exactly falls within the scope of VoIP or not.

16   There has been no specific fencing that they are putting in.

17   We submit that the claims just cover audio content that's

18   encoded and requires decoding.

19             And if we could pull up, please, the '710 patent

20   at column 22.  And if you could focus in on claim 12,

21   please.

22             This is where Comcast made their argument

23   about -- thank you.

24             So what was left out of Comcast's quote here, it

25   says that depending on the master device to transcode audio

1     and video, this claim specifies particular formats -- MPEG

2     two, MPEG 4 and IP-TV.  Unlike VoIP, those are not generic

3     protocols.  Those are specific, well defined protocols.

4     That's what this is talking about here.  That doesn't mean

5     that VoIP generally can't cover audiovisual data.  This is

6     just referring to this -- this particular claim is limited

7     to particular formats that are being used.

8             So giving the specification its broad discussion

9     of applications covering audio data, VoIP should be

10    construed consistent with its plain and ordinary meaning as

11    referring to audio data that's encoded and is partially

12    decoded by a device before it goes to the remote.

13            THE COURT:  All right.  Anything further, Ms.

14    Petty, before we move on to the final term?

15            MS. PETTY:  No.  Thank you, Your Honor.  I think

16    our positions are set out in our brief and what we said

17    before.  Thank you.

18            THE COURT:  Very well.  We're ready to move onto

19    our final term, master device.  I will just let the parties

20    know each side has ten minutes for this final term.  We've

21    already -- considering the time I've added in because of the

22    bumpy start with the technology, I still want to keep us on

23    a time frame.  I have added in additional time as I said I

24    would, but now we're getting close to the point where we're

25    exceeding that.  So ten minutes per side if you need the

1    full ten minutes.

2              So master device.

3              MR. FRANKEL:   Thank you, Your Honor.   I will try

4    to be brief, Your Honor.

5              Here, master device has a plain and ordinary

6    meaning.   It's tied to the term slaved device, and I don't

7    think people will be using terms like this going forward,

8    but it does have a meaning to the person of ordinary skill

9    in the art.

10             A portion of the logic of the master device is

11   controlling a portion of the functionality of the slave

12   device.   That's what it means in the skill of the art, and

13   there has been no dispute by Comcast that that is the plain

14   and ordinary meaning of this term.

15             Comcast's proposed construction seeks to take

16   the agreed-upon construction for console component, which is

17   something that was defined during prosecution, and app1ly it

18   to master device.   Now, we would submit that there's no

19   basis to do so.

20             If we turn to the next slide.

21             Here is a claim that uses the term master

22   device, and it's talking about the master device controlling

23   some of the functionality of the slave device.

24             If we go to the next slide, please.

25             These terms are not used interchangeably.   They

1    are not used interchangeably in the specification and they

2    are used in different claims to cover different devices with

3    different features.

4           We've put up one example of a master device

5    claim, a different example of a console component claim.

6    The only basis that Comcast has to link the two is that when

7    the master device claims were added, there's a feature where

8    the master device is doing some of the decoding, and as the

9    written description support, the inventor pointed to the

10   portion in the specification where it talks about the

11   console component also doing decoding.  That doesn't mean

12   that the master device is interchangeable with the console

13   component.  It means that the portion of the specification

14   talking about having the upstream device doing some of the

15   decoding of the downstream device was referring to the

16   console component.

17          So I will reserve the rest of my time unless the

18   Court has any questions.

19          THE COURT:  Not at this time.  Let's hear from

20   Comcast.

21          MS. PETTY:  Thank you, Your Honor.  So if we

22   could start at slide 135, please.

23          So, Your Honor, NexStep has suggested that this

24   term doesn't require construction and it basically

25   encompasses any device that accesses control of the remote

1    control device, but the intrinsic evidence makes clear that

2    master device is used interchangeably within its scope, is

3    co-extensive with and indeed has to be co-extensive with

4    status console component, which is an agreed-upon

5    construction.

6              Turning to slide 136, please.

7              The dispute really boils down to whether master

8    device and console are used interchangeably such that the

9    master device should be construed to be a piece of consumer

10   electronics.

11             So if we start -- let's go to slide 138, please.

12             Slide 138 reflects the agreed-upon construction

13   of console component.  This is consistent with how NexStep

14   expressly defined the term console component in the

15   prosecution of the '130 patent -- components that are either

16   freestanding or integrated into another device, such as a

17   set top box, a TV, media center or any similar consumer

18   electronics, and this term would have console as used in the

19   specification.

20             If we could turn to 139, please.

21             Console component is used throughout the

22   specification, but, in fact, the term master device appears

23   nowhere in the specification.  It's recited only in the

24   claims.

25             So turning to slide 140, please.

1              Given that the term master device appears

2    nowhere in the specification itself, during prosecution,

3    when NexStep added the claims recited in master device, and

4    they were not original to the application, they were added

5    later, NexStep needed to show how the specification

6    supported this term, the master device term, when it offered

7    claims reciting a master device instead of a console.  And

8    importantly, when NexStep did this, it pointed to the

9    application's description of the console, and we see here on

10   the final history that NexStep pointed specifically to the

11   paragraph 15 and 100 of the original application.

12             And those are excerpted for Your Honor on the

13   right-hand side.  Again, they reference the console.  The

14   first portion of the specification doesn't even mention

15   decoding specifically.

16             So turning to slide 141, the Court is well

17   familiar with all of this and we won't belabor it here,

18   specifically since the Court has been so generous with the

19   time limits already.  But fundamentally, NexStep had to have

20   written description in the specification when it added those

21   new claims, and if it doesn't, if the master device, the

22   scope of the master device claim exceeds that for which it

23   provided written description support, the claims are invalid

24   under 35 U.S.C. 112 for lack of written description and

25   potentially also lacks enablement.

1          So turning to NexStep's arguments in response,

2     if we could turn to slide 142, please.

3          NexStep has argued that Comcast has relied just

4     on a single statement in the '130 patent prosecution for

5     this argument, but that is because this term master device

6     doesn't appear anywhere in the specification, and that's

7     also because the master device claims were newly added

8     during the '130 prosecution.  So as a matter of common

9     sense, that's the first time it came up, that was the first

10    time they had to show support in the written description.

11    And, again, Your Honor is familiar with the law that given

12    these are all part of the same related patent family and

13    share a specification, the file history of the '130 patent

14    is relevant to the other terms as well, to the other patents

15    as well.

16          If we could go to the next slide, please.

17          NexStep has suggested that that statement in the

18    prosecution history, Your Honor, is limited to the function

19    of decoding IP-TV signals and they've argued that this does

20    not rise to the level of a clear and unambiguous disavowal.

21          Please go to the next slide.

22          But this is a straw man argument, Your Honor.

23    NexStep has at least in its briefing never really addressed

24    their argument based on Section 112.  We're not making a

25    disclaimer argument here.  We're simply arguing that NexStep

1    was required to have support in the written description when

2    it filed those claims, and whether it added the master

3    device claims, it pointed only to the console component

4    description for support and all parties agree that the

5    console has to be a consumer electronic.

6              So turning to the next slide, 145.

7              Again, these are the same excerpts that we

8    included earlier.  Nothing in these excerpts is limited to

9    decoding specifically.  Paragraph 15 is directed to the

10   console generally.  Paragraph 100, just a few lines above

11   this excerpt here, there's a statement that this is the

12   console hardware, description of some of the hardware that

13   may be available to the console.

14             If we could go to slide 146, please.

15             And finally, NexStep has argued that the master

16   device and console component claims should not be construed

17   to be co-extensive because of some type of claim

18   differentiation argument, but NexStep itself equated those

19   two different claim terms when it relied on the written

20   description of one as support for the other, and moreover,

21   that doctrine doesn't apply.  And we've put the law on the

22   screen here.  Your Honor is familiar with it.  But where

23   none of those two, none of those universes of claims depend

24   on each other.  There's no cross-pollination between the

25   master device claims and the console component claims.  They

1      are two separate universes of claims, and the Federal

2      Circuit has held that in the context of two different

3      independent claims, claims with different terminology can,

4      in fact, define the exact same subject matter, and that, in

5      fact, it's not unusual to do so.

6              So turning to slide 147, please.

7              I'm happy to answer any questions, but we would

8      respectfully request that the Court construe the term as

9      NexStep itself defined the console component during

10     prosecution as a set top box, a TV, a media center, or any

11     similar consumer electronics.

12             Thank you.

13             THE COURT:  You've pointed out that during the

14     patent prosecution for these patents, that the plaintiff

15     equated the terms master device and console and can't now

16     argue that master device is broader than a console.

17     Otherwise the claims reciting master device would be invalid

18     for lack of written description.  I'm not sure if you're

19     arguing that -- making an invalidity argument now or as an

20     alternative, if the Court doesn't adopt Comcast's

21     construction.  You've confused me a little bit as to how you

22     want me to address that argument about lack of written

23     description.

24             MS. PETTY:  Thank you, Your Honor.  Yes, we're

25     happy to address that.

1                    I think, you know, Mr. Lee referenced earlier

2       that statements made during prosecution are relevant to

3       matters of claim construction and to claim scope, so I

4       think, you know, we would point to that and say that

5       supports that a master device should be construed to be

6       co-extensive with the console component.

7                    You can look to the representations that NexStep

8       made during prosecution as well as to those two terms in the

9       claims.  They are used very similarly, both the console

10      component and the master device are described as performing

11      this transcoding or decoding from one audio format to

12      another, usually from voiceover to a remote control device

13      format.  And you'll see similar limitations across the

14      master device claims and the console component claims.  It's

15      recited as performing the same function.

16                   So we would submit that it's proper to tackle

17      claim construction and to construe the term as a console

18      based on that intrinsic evidence with an eye toward, you

19      know, to the extent there's any ambiguity in the claims,

20      they should be construed so as to preserve their validity,

21      but if, you know, if the Court feels that that is not

22      appropriate, then we think it would be, to the extent it's

23      construed to have a broader scope than console, we do think

24      NexStep has a significant special 112 problem.

25                   THE COURT:  All right, then.  I will ask

1    Mr. Frankel, any further response?

2              MR. FRANKEL:   Just briefly, Your Honor.

3              So it does remain undisputed that master device

4    has a plain and ordinary meaning to the person of ordinary

5    skill in the art.  It's a device that is the logic of the

6    master device controlling some of the functionality of the

7    slave device.  Because that is a term that's well-known to

8    the person of ordinary skill in the art, there's no need to

9    define it in the specification.

10             Mr. Thomas, if we could have Comcast slide 140,

11   please.

12             So this is the only place in the entire file

13   history where Comcast contends that master device is limited

14   to be co-extensive with the console component.  Now, if we

15   look at the -- and see if I can use my pointer here.

16             Do you see an arrow on the screen, Your Honor?

17   I'm messing up the image here.

18             Okay.  If we look at the bottom left portion

19   over there where we have the red circle --

20             THE COURT:  I do.  I see the red circle.

21             MR. FRANKEL:  I should leave the annotations to

22   Mr. Thomas.

23             What's actually said here is the pulse code

24   modulation decoding by the remote is described in one

25   portion of the specification, and then the reliance on the

1   master device to decode IP-TV, MPEG 2, MPEG 4, DVD playback,

2   is described as 15 in paragraph 100.

3          So all that's being said is that the written

4   description support for having a separate device do some

5   decoding is found in these two paragraphs.  And if we look

6   at the paragraphs on the right, there's a discussion where

7   it says that tethering the palm-held device so that it

8   depends on logic and resources of the console, it runs

9   against the trend.  The point there is that the master

10  device's logic is controlling some of the functionality of

11  the remote.  That is the support in the specification it's

12  pointing to.

13          The agreed-upon construction for console

14  component as being a consumer electronics device is not

15  referenced in these portions of the specification it cited

16  to, so there's no reason to eliminate the plain and ordinary

17  meaning of master device and substitute in the very

18  different meaning of console component.

19          So if the Court has any questions, I would be

20  happy to address them, but otherwise, that's all that we

21  have.

22          THE COURT:  Nothing further for NexStep.

23          Ms. Petty, anything else?

24          MS. PETTY:  Just very briefly, Your Honor.

25          Because the only embodiment of a master device

1   that is allegedly described in the specification is this

2   consumer electronics, to the extent the term is construed to

3   be broader than NexStep itself has defined console

4   component, we would be left wondering, what is that scope?

5   We're not on notice of sort of what is fairly described in

6   the patent.  What is the delta between the construction of

7   console component and the far reaches of master device?

8            So, you know, we would submit, Your Honor, that

9   construing master device to be consistent with the only

10   intrinsic evidence that describes an embodiment of what's

11   performing this processing would be consistent and

12   appropriate.

13           THE COURT:  All right, then.  Let me thank

14   everyone and also for your assistance in navigating some of

15   our technical problems at the start.

16           I will take this under advisement and get out a

17   written claim construction order within the time I set in

18   the scheduling order.

19           So with that, is there anything further from

20   NexStep before we conclude?  Anything further from the

21   plaintiff before we conclude?

22           MR. FRANKEL:  Nothing further from NexStep, Your

23   Honor.  Thank you.

24           THE COURT:  Very well.  And anything further on

25   behalf of Comcast from anyone?

1          MR. LEE:  This is Bill Lee.  Nothing for

2     Comcast.

3          THE COURT:  Very good.  All right.  Well, thank

4     you everyone.  Stay well and be safe.  Hopefully, the next

5     time we conduct a proceeding, perhaps it will be in person,

6     fingers crossed, and then we won't have to rely on our

7     technology, but it was good to see everyone.  Stay well

8     and take care.  I'm going to leave the meeting now.  Thank

9     you.

10          (Counsel respond, "Thank you, Your Honor.")

11          (Conference concluded at 1:46 p.m.)

12                    -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25